Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

KEVIN ERIC CURTIN,
*Defendant-Appellant.*

No. 04-10632

D.C. No.
CR-04-00064-
RCJ/PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert C. Jones, District Judge, Presiding

Argued and Submitted
October 19, 2005—San Francisco, California
Submission Vacated October 25, 2005
Resubmitted March 21, 2006

Filed April 4, 2006

Before: J. Clifford Wallace, Stephen S. Trott, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Wallace;
Dissent by Judge Trott

**COUNSEL**

Cal J. Potter, III, Esq., Las Vegas, Nevada, for appellant Kevin Eric Curtin.

Daniel J. Bogden, United States Attorney; Nancy J. Koppe, Assistant United States Attorney, Las Vegas, Nevada, for respondent United States of America.

## OPINION

WALLACE, Circuit Judge:

Curtin appeals from his conviction and sentence for traveling across state lines with intent to engage in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b), and of use of an interstate facility to attempt to persuade a minor to engage in sex, in violation of 18 U.S.C. § 2422(b). We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for a new trial.

## I.

On the afternoon of February 11, 2004, Las Vegas Metropolitan Police Department Detective Michael Castaneda was acting undercover on the Internet as a 14-year-old girl using the screen name "christine13." Castaneda entered a chat channel labeled "ltgirlsexchat" and received an instant message from Curtin, who used the screen name "M-42SOCAL."

The detective, as "Christy," and Curtin "chatted" through instant messaging for approximately four hours. They exchanged photos early in the conversation. Castaneda sent Curtin a picture of a female police officer, taken when she was fourteen years old. Curtin said his name was "Kenny" and that he was forty-two years old, divorced, and living in Anaheim, California. He told Christy that he was planning to travel to Las Vegas on Friday, February 13 and invited her to go to a "Penn and Teller" show on Sunday, February 15. Christy agreed.

Curtin extensively discussed sex with Christy during this conversation, saying that he would love for her to "spend the night" after the show and hoped to "get a room." Curtin told Christy "I want to make you happy . . . . If you were masturbating and fantasizing about sex, I'd love to have sex with you." He added that they "could just make out or I could just give you oral sex or we could just fool around." Finally, Curtin made plans to meet Christy in the bowling alley of a Las Vegas casino at 2:00 p.m. on Sunday, February 15. At the end of the conversation, Curtin asked Christy to try sleeping naked that night, and to "imagine my face moving between your legs and licking you. Imagine my tongue penetrating you."

The next day, Curtin sent Christy an email message saying "I can't tell you how much I'm looking forward to Sunday. We're going to have a great time." The detective and Curtin later that day had another "chat" during which Curtin continued to make explicit references to having sex with Christy. Curtin concluded the "chat" by confirming their meeting and telling Christy he would introduce her to Penn and Teller as his niece, adding, "Let's not get caught, ever."

On that Sunday, the police officer whose picture was sent to Curtin waited in the bowling alley as a decoy, dressed in the clothes that Christy indicated she would be wearing. Eight to ten other law enforcement officers were also present. Curtin entered the bowling alley at 1:45 p.m. and walked towards the area where the decoy officer was sitting. He walked past her and then turned and walked past her again, looking at her each time. Curtin then left the area where the decoy was sitting and went to the back of the bowling alley, where he used his personal digital assistant. At the request of law enforcement officers, a casino security guard approached Curtin and asked for identification. Curtin showed the guard a United States passport and subsequently left the bowling alley area of the casino.

Curtin reentered the bowling alley approximately 2:05 p.m. He looked around and again walked to the area where the decoy officer was sitting. After less than a minute, he moved even closer to her, looking in her direction the entire time. He stopped behind the officer and she turned and said "hi" to him. Whether he said "hi" in return is disputed.

He then left the bowling alley and started getting into a van, at which point law enforcement officers stopped and asked him for identification. He was detained by police and advised of his rights under *Miranda*. After Curtin waived these rights, he agreed to speak with the law enforcement officers. In a voluntary statement, he stated that he had traveled by car to Las Vegas for meetings. He explained that he was at the bowling alley to meet a female friend he had met on the internet. He admitted to using the screen name and email address used to contact Christy. Curtin explained that he often enters chat rooms and "role play[s]" as if he is engaged in "daddy/daughter" type conversations, and that he expected Christy to be a thirty- to forty-year-old woman pretending to be a girl.

Curtin was then arrested by the Las Vegas police. Upon searching his van and hotel room, police seized his digital assistant and laptop computer. The digital assistant contained over 140 stories about adults having sex with children. The laptop contained a list of chat channels that Curtin had accessed in the past, as well as pictures of girls whose names matched some of those in his "chat" list.

Curtin was indicted on one count of travel with intent to engage in a sexual act with a juvenile, in violation of 18 U.S.C. § 2423(b), and one count of coercion and enticement, in violation of 18 U.S.C. § 2422(b). Curtin filed two motions in limine asking the district court to exclude the stories found on his digital assistant from evidence. The district court denied these motions in limine. On the second day of trial, the government offered two of the stories, "My Little Sister" and "Love for the World," to show modus operandi, intent, prepa-

ration, and knowledge. They were admitted over Curtin's objection. The engineer who extracted the stories from the digital assistant testified that both stories were about a father having sex with his young daughter and the daughter's enjoyment of the experience. However, when the government sought to introduce a third story, "Melanie's Busy Day," the district court stopped the questioning. The court allowed the government to ask general questions without admitting the stories, such as whether they all related to sex between a minor and an adult. However, recognizing the highly prejudicial nature of the stories, the court held that the story could be entered into evidence only if it tied into Curtin's intent, knowledge, preparation, or modus operandi.

The government then asked the court to make a preliminary legal determination about the admissibility of the remaining stories. The government argued that "Melanie's Busy Day" was admissible to show general intent, modus operandi, preparation, and knowledge because it had language similar to that used by Curtin in his email to Christy, namely, language concerning oral sex and a child masturbating. The government argued that "Missing Big Brother," which discussed how the adult did not want to hurt the child during sex, was also admissible for intent, modus operandi, preparation, and knowledge. The government made similar arguments with regard to seventeen other stories, with titles such as "I'm Being Molested," "The Good Girl," "A Relative Interest," "Restrictions," "Teaching the Kids," and "Mommy Juice."

The following morning, Curtin renewed his objection to the admission of the stories, arguing that they were highly prejudicial and were being admitted to show propensity. The district court held that if the government could cite a part of the story that related to one of the permissible purposes under Federal Rule of Evidence Rule 404(b), then the court would admit the entire story to show general intent.

The district court admitted to being unable to read the stories because they were so disturbing. "I thought about this

problem overnight because I want to address the relative over-
whelming prejudice versus the purpose. I read the first story
and a little bit of the second. *That's as far as I could get*,
which is confirming [defense counsel's] statement. It has a
tendency to overwhelm you and overwhelm the jury." How-
ever, after more argument, the district court agreed to give a
limiting instruction and to admit five of the stories: "My Little
Sister" (which involved incest and the impregnation of a nine-
year-old girl), "Love for the World" (which involved incest),
"Restrictions" (same), "Daddy's Lessons" (same), and "Mela-
nie's Busy Day" (which involved an eleven-year-old girl initi-
ating sex with, among others, her father and her teacher).

The limiting instruction given was as follows:

> A person cannot be charged nor convicted of liter-
> ature that they read or that they possess. That's why
> I'm giving you the instruction.

> But the Government has the obligation to prove,
> beyond a reasonable doubt, that the defendant had
> the wrongful intent. They may offer possession of
> such literature to show that. . . .

> You may take this kind of evidence on the ques-
> tion of whether the defendant actually possessed the
> intent.

> You may also take it on the additional questions
> which go to the question of intent, whether he prac-
> ticed in this alleged conduct methodology consistent
> with literature that he had or tending to show that he
> prepared to commit the acts or that he had knowl-
> edge, that is, of how to commit the act or that the act
> was illegal. . . .

> So, for those four reasons, only, the Government
> is offering to show that the defendant possessed this

literature; intent, method, preparation, and knowl-
edge. And you may only take it for that purpose.

Again, you have a constitutional right. You have
that right. You would want to protect the defendant's
right to possess any kind of literature and to read it
or not read it.

You must not allow this kind of evidence to bias
you, generally, against the defendant on the ultimate
question of guilt or innocence. You must not do that.

## II.

Curtin contends that the five stories were inadmissible
character evidence, introduced to show propensity in violation
of Rule 404(b) of the Federal Rules of Evidence. The govern-
ment responds that the stories fall outside the parameters of
Rule 404(b) because they are inextricably intertwined with the
charged crimes. Alternatively, the government argues that the
stories were properly admitted under Rule 404(b) to prove
Curtin's intent.

## A.

The government argues that the admitted stories were "in-
extricably intertwined" with the facts giving rise to the indict-
ment against Curtin and therefore not "other acts" evidence
within the scope of Rule 404(b). We review de novo the ques-
tion of whether the evidence was within the scope of Rule
404(b). *See United States v. DeGeorge*, 380 F.3d 1203, 1219
(9th Cir. 2004).

**[1]** Two categories of evidence may be considered "inextri-
cably intertwined" with a charged offense and therefore
admitted without regard to Rule 404(b). First, evidence of
prior acts may be admitted if the evidence "constitutes a part
of the transaction that serves as the basis for the criminal

charge." *DeGeorge*, 380 F.3d at 1220, *quoting United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). In *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004), we held that a government report detailing individual fraudulent acts was "inextricably intertwined" with the underlying conspiracy charge because the acts themselves comprised the conspiracy. Therefore, the report was admissible without regard to Rule 404(b). Similarly, in *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003), we concluded that the defendant's theft of cocaine from a shipment, which was itself the basis for the conspiracy, was "inextricably intertwined" with the conspiracy charge.

**[2]** Second, prior act evidence may be admitted without regard to Rule 404(b) "when it [is] necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *DeGeorge*, 380 F.3d at 1220, *quoting Vizcarra-Martinez*, 66 F.3d at 1012-13. "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992), *quoting United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984). In *United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002), the defendant was charged with importing over 1,500 pounds of marijuana. His defense was that he was tricked into transporting the marijuana by the chief government cooperating witness. This witness testified at length about prior drug runs that Beckman had made on his behalf. We held that the witness's testimony was "inextricably intertwined" with the charged offense, because it was "intended to establish [the witness's] relationship to Beckman [and] to show that the relationship was ongoing . . . ." *Id.*

**[3]** The fact that Curtin was in possession of stories detailing sex with children at the time he went to meet "Christy" is insufficient to support the introduction of the stories with-

out regard to Rule 404(b). Curtin was charged with traveling across state lines with intent to engage in a sexual act with a minor, and with attempting to persuade a minor to engage in sex. The possession or content of the stories was not a part of the "transaction" that led to the present charges. Second, the admission of the stories was not required for the prosecution to "offer a coherent story." The prosecution would have had no difficulty in presenting all relevant evidence, including the "chat" conversations, Curtin's admission that he was "M-42SOCAL," and Curtin's behavior at the meeting place, without the admission of the stories. Thus, the stories were not "inextricably intertwined" with the charged crimes.

## B.

In the alternative, the government contends that the stories are admissible under Rule 404(b) regardless of whether they are inextricably intertwined with the crime. We review a district court's admission of evidence under Rule 404(b) for an abuse of discretion. *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002).

**[4]** We use a four-part test to determine whether evidence is admissible under Rule 404(b). *United States v. Spillone*, 879 F.2d 514, 518 (9th Cir. 1989). First, "there must be sufficient evidence to support the jury's finding that the defendant committed the other [act]." *Id.* Second, "the other [act] must not be too remote [in time]." *Id.* at 519. Third, when admitted to prove intent, "the prior act must be similar." *Id.* Finally, "the prior act must be introduced in order to prove a material element of the case." *Id.* The main issue here lies in the third element: whether there is similarity between the possession of the stories and the crime with which Curtin is charged.

Curtin objected to admission of the stories in the district court, relying on *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998) (as amended). Shymanovitz was a middle-school guidance counselor who was charged with sexually and physi-

cally abusing several of the boys under his supervision. *Id.* at 1155. Prior to trial, the government sought to introduce two magazine articles from sexually explicit magazines found in Shymanovitz's home, arguing that they were relevant to establishing intent. The articles were both presumably fictional stories. One depicted sex between a father and son, while the other depicted sex between a priest and a child. The court deferred ruling on the motion.

At trial, the court permitted a police officer to testify that at Shymanovitz's house she seized, among other things, condoms, surgical gloves, children's underwear, and sexually explicit magazines. The officer testified in great detail, over defense counsel's objections, about the contents of four of these magazines. She told the jury that the magazines contained explicit photographs of homosexual sex and described the photographs and the contents of the two articles in detail. The two articles were subsequently entered into evidence. *Id.* at 1155.

**[5]** Both *Shymanovitz* and this appeal address whether the reading material at issue was admissible under Rule 404(b). We concluded in *Shymanovitz* that the magazine articles failed to constitute a Rule 404(b) "bad act." "[P]ossession of lawful reading material is simply not the type of conduct contemplated by Rule 404(b)." *Id.* at 1159. Additionally, we held that possession of lawful reading material was not similar to actual criminal conduct, thus failing the third criterion of the *Spillone* test. "[T]here is simply no doubt that a wide gulf separates the act of *possessing* written descriptions or stories about criminal conduct from the act of *committing* the offenses described." *Id.*[1]

---

[1]The dissent argues that this case differs from *Shymanovitz* because the crimes at issue in that case did not involve subjective intent. But even if *Shymanovitz* involves slightly different facts, its legal rule does not distinguish between specific intent crimes and other crimes. "Under the government's theory, the case against an accused child molester would be

**[6]** On the issue of similarity, *Shymanovitz* conforms with the rest of our case law. In *Vizcarra-Martinez*, the defendant was charged with conspiracy to possess a chemical with reason to believe it would be used to make methamphetamine. 66 F.3d at 1009. The district court admitted evidence that Vizcarra-Martinez was in possession of a personal-use amount of methamphetamine at the time of his arrest. We reversed. "We simply cannot assume . . . that Vizcarra-Martinez's use of methamphetamine tended to prove that he knew that the chemical in his possession would be used in the methamphetamine manufacturing process." *Vizcarra-Martinez*, 66 F.3d at 1015. The cases in which we have

---

stronger if he owned a copy of Nabokov's *Lolita*, and any murder defendant would be unfortunate to have in his possession a collection of Agatha Christie mysteries . . . ." *Shymanovitz*, 157 F.3d at 1159. Put simply, *Shymanovitz* is replete with language that dictates the outcome of this appeal. We may not ignore its controlling effect on this case. *See Barapind v. Enomoto*, 400 F.3d 744, 751 n.8 (9th Cir. 2005) (en banc) (per curiam).

The dissent's discussion of cases like *United States v. McCollum*, 732 F.2d 1419, 1425 (9th Cir. 1984), which involve the admission of similar prior criminal convictions to prove intent, is equally off point. In *McCollum*, we allowed admission of a prior conviction for armed robbery to negate the defendant's defense of acting under hypnosis. The relationship between the prior crime and the act charged is obviously far closer in McCollum's case than it is in Curtin's. Curtin's case involves otherwise lawful reading material that is not similar to the crime with which he is being charged. Essentially, the government here seeks to introduce possession of material that describes one type of criminal conduct, namely incest with minors, to prove intent to commit another type of criminal conduct, namely crossing state borders to have sex with a minor. This is impermissible under our caselaw.

The dissent also argues at length that Curtin's case is different because Curtin was actually in possession of the stories at the time of his arrest. However, the government never argued relevance based on physical possession. In any event, this is a fallacious distinction because the stories were saved as documents to Curtin's handheld computer. In the absence of any evidence to the contrary, we should not infer that Curtin planned to "use" the stories or had the stories in mind simply because he was carrying his computer at the time of his arrest.

allowed Rule 404(b) evidence show a much stronger connection between the "other act," which is often a crime in itself, and the charged crime. In *United States v. Vo*, 413 F.3d 1010, 1018-19 (9th Cir. 2005), where the defendant was charged with possession of methamphetamine with intent to distribute, we allowed the admission of a prior conviction for drug selling. "Vo's prior conviction was evidence of his knowledge of drug trafficking and distribution in general. The conviction tended to show that Vo was familiar with distribution of illegal drugs and that his actions in this case were not an accident or a mistake." *Id.* at 1019.

**[7]** *Shymanovitz* does recognize a narrow exception for "modus operandi" evidence: evidence involving acts by the defendant that are "so nearly identical in method as to earmark the charged offense the handiwork of the accused and that are so unusual and distinctive as to be like a signature." *Id.* at 1159 n.9 (internal punctuation and citation omitted). "[U]se of modus operandi evidence is rare, and the similarities must be specific and detailed and clearly set the particular offense apart from the general body of such offenses." *Id.*

**[8]** The evidence in this case is not sufficiently detailed and specific to fall within the exception. The stories did not describe specific methods of committing the first offense with which Curtin was charged: traveling across state borders to have sex with a minor. Rather, the stories mostly involved explicit descriptions of incest. Thus, the stories do not reveal a relevant modus operandi to commit the charged crime, and are inadmissible. The issue is closer with regard to the charge of use of an interstate facility to attempt to persuade a minor to engage in sex. The government argued that the language in the stories was similar to the language used by Curtin in his "chat" conversations. We conclude that *Shymanovitz* forecloses our acceptance of the government's position. The conduct with which Curtin was charged, and the language that Curtin used, can "hardly be construed as either distinctive or remarkable in the universe of sexual offenses against minors."

*Id. Compare United States v. Dhingra*, 371 F.3d 557, 566-67 (9th Cir. 2004) (as amended) (allowing introduction of Rule 404(b) modus operandi evidence where "[i]n both instances, Dhingra contacted a minor under the age of 18 years over [instant messenger] for the purpose of soliciting sexual activity, arranged to meet, and at the meeting attempted to engage in sexual activity by persuasion and coercion."). The similarities between the stories and Curtin's conduct were not distinctive or unusual enough to render the stories admissible as modus operandi evidence.[2]

---

[2]Contrary to the dissent's assertion, we have not "made relevant literature off limits in the Ninth Circuit as a matter of law." Nor do we "hamstring[ ] the capability of the rule of law to cope in this Circuit with adults who see children as sexual prey." As pointed out above, in this case the prosecution may rely on Curtin's presence in a chat room called "ltgirlsex-chat," the "chat" conversations themselves, Curtin's admission that he was "M-42SOCAL," and Curtin's behavior at the meeting place.

In terms of otherwise lawfully-possessed literature, modus operandi evidence and inextricably intertwined evidence remain admissible. Here, however, the jury was asked "to infer from behavior on one occasion something about the nature of a person and then to infer from that how the person probably would have behaved on another occasion when the only connection between the two occasions is that the [jury] believes that people of a certain type would act the same way both times." 1 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual § 404.02[9] (8th ed. 2002). Without more of a connection between the literature and the accused crimes, the literature is no more than character evidence introduced to show propensity, and highly prejudicial character evidence at that.

The dissent argues at length that the evidence was necessary to refute Curtin's testimony and "aggressive defense" of his intent to meet an adult, and attempts to distinguish *Shymanovitz* because Curtin actually testified. However, the stories were not offered for impeachment, on which we express no opinion. Nor do we believe that the stories were necessary given the strength of other evidence introduced by the government. In any event, evidence is not admissible solely because it may be necessary or helpful. Wholly apart from its prejudicial effect, we have held that "[t]he mere possession of reading material that describes a particular type of activity makes it neither more nor less likely that a defendant would intentionally engage in the conduct described and thus fails to meet the test of

The government relies on *United States v. Allen*, 341 F.3d 870 (9th Cir. 2003), to distinguish *Shymanovitz*. In *Allen*, the defendants were charged with violating federally protected rights on the basis of race and religion. We allowed the introduction of "skinhead and white supremacist evidence," including color photographs of the defendant's tattoos (e.g., swastikas), Nazi-related literature, group photographs including some of the defendants (e.g., in "Heil Hitler" poses and standing before a swastika that they later set on fire), and other skinhead paraphernalia. *Id.* at 885-86. We distinguished *Shymanovitz*: "Key to our reasoning [in *Shymanovitz*] was the fact that the testimony . . . was not relevant to proving any of the elements of the crime for which the defendant was convicted . . . ." *Id.* at 887 n.25. The government thus contends that, when read together, "*Shymanovitz* and *Allen* stand for the principle that relevant literature is admissible to prove intent."

**[9]** However, the government's comparison to *Allen* does not save the day. First, many of the items admitted into evidence in *Allen* involved more than the possession of reading material. The defendants were active participants in "Heil Hitler" poses and had posed with and burned a large swastika. Second, unlike in *Shymanovitz*, there is no indication that the reading material in *Allen* was fictional. Third, the evidence at issue in this case, and in *Shymanovitz*, was extremely prejudicial. Finally, it is possible that the evidence in *Allen* would have been admissible under the "inextricably intertwined" exception outlined above. Our holding here is controlled by *Shymanovitz*. The district court committed an abuse of discretion by admitting the stories.

relevancy under Rule 401." *Shymanovitz*, 157 F.3d at 1158. Here, the materials in Curtin's possession told stories of incestuous sexual acts that were different from those he was accused of intending to perpetrate. They were offered as substantive evidence of guilt, and we simply hold that their admission in this case was an abuse of discretion.

## C.

The government fails to argue harmless error and thus the issue is ordinarily waived. *See United States v. Varela-Rivera*, 279 F.3d 1174, 1180 (9th Cir. 2002). We may, however, consider harmlessness *sua sponte* in "those unusual cases in which the harmlessness of any error is clear beyond serious debate and further proceedings are certain to replicate the original result." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100 (9th Cir. 2005). "[T]he court's certainty as to the harmlessness of the error . . . is of particular importance." *Id.* at 1101 (citations omitted). "[E]rror is harmless if we can say with fair assurance that it did not have a substantial effect, injurious to the defendant, on the jury's decision-making process." *Arnold v. Runnels*, 421 F.3d 859, 867 (9th Cir. 2005) (citations omitted).

**[10]** Here, we do not have the requisite level of certainty that the error was harmless to consider the issue *sua sponte*. Most of the sexual activity described in the stories admitted from Curtin's PDA was incestuous, a particularly prejudicial taboo. The admitted stories were so highly disturbing that even the district court judge stated he was unable to read them. The issue of harmless error is waived.

## III.

Curtin contends in his reply brief that the district court abused its discretion pursuant to Rule 403 by admitting the stories because the probative value of the stories is substantially outweighed by the danger of unfair prejudice to Curtin. However, Curtin did not specifically and distinctly make a Rule 403 argument in his opening brief. "[O]n appeal, arguments not raised by a party in its opening brief are deemed waived." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (citation omitted); *see also Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). The argument is waived. In any event, for the same reason we cannot say that the error was harmless, we

cannot say that the admission of the materials on Curtin's PDA was not unduly prejudicial.

## IV.

**[11]** Curtin argues that the government's failure to request a copy of the surveillance video from the casino violated due process and entitled him to a spoliation instruction. We disagree. The government's duty to preserve evidence arises when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). As Curtin failed to show that the video had any exculpatory value, the district court did not abuse its discretion in declining Curtin's request for a spoliation instruction.

**[12]** Curtin also argues that the district court failed to instruct adequately on what constitutes a substantial step. The district court instructed in accord with the model jury instructions that "mere preparation was not a substantial step." *See* Model Crim. Jury Instr. 9th Cir. § 5.3 (2003). This fairly and adequately covered the issue. *See United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir. 1985) ("So long as the instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion.").

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

TROTT, Circuit Judge, dissenting:

During the 20th Century, the four walls of a family's home provided substantial protection from marauding sexual predators on the prowl for children and unsuspecting minors to assault. Locked doors and windows could normally safeguard a dwelling from invasion, as well as shelter parents' vulnerable children from harm. Distant parks, playgrounds, malls, and sidewalks surrounding school yards were the child molester's preferred hunting grounds. No longer. Now, the Internet is upon us, and it allows cunning sexual vultures repeatedly to enter the bedrooms of immature children where, by seductive and calculating means, unwary children are enticed to leave the security of their homes and to venture into unspeakable dangers. Moreover, the invaders themselves do so invisibly, appearing only on a video screen, unseen by the unsuspecting adults on site. This case provides an example of this frightful situation which generations not yet familiar with the dark side of the Internet have been slow to recognize.

With the walls of our homes breached by the Internet, our next best defense is the law. Unfortunately, this case reveals that the laws and the rules of evidence upon which society relies to protect itself from cruel deviancy are now as porous as the walls of our homes, allowing lawbreakers to pull the wool over the eyes of the jurors delegated to ensure that our laws are faithfully implemented. It seems that the law of relevancy is now more concerned with protecting a sexual predator's obscene manuals on what to do to children than with protecting the real children upon whom they practice their perversions, as this case illustrates.

Curtin's explanation to the jury for his Internet behavior with "christy13" and trip to Las Vegas was that he intended to act out an incestuous sexual fantasy with her, but that he expected her to be an adult who would pretend to be his innocent unspoiled daughter. Although he called his sexual fantasy "daddy daughter," he denied that the "daughter" would

be a minor. If worthy of belief, this intent would defeat the prosecution's case, which required proof of an intent to engage a minor in unlawful sexual activity. However, Curtin had on his person at the time of his anticipated encounter with "christy13" obscene literature tending without ambiguity to prove that the object of his incest fantasy was a child, not an adult. My respected colleagues conclude that the district court erred in admitting this inculpatory literature because — *as a matter of law* — it was not relevant. I disagree. Therefore, I respectfully dissent.

# I

The evidence developed against Kevin Curtin by the Las Vegas Metropolitan Police Department suggests on its face that he is a dangerous predatory pedophile who uses the Internet electronically to enter the homes of his immature juvenile female victims in order to lure them into danger. Curtin's M.O., or modus operandi, involving calculated "grooming" and enticement is well known to the police who work this detail. Here, Curtin contacted his prey through a chat room called "ltgirlsexchat," which, according to the evidence, is a place on the Internet where people go to talk sex with little girls. The evidence reveals also that he planned a family cover story for his time with his victim. He, as Uncle Kevin, would introduce her as his "niece." In addition, he asked her if she was working with the police in order "to get guys who make out with 14-year-old girls." These aspects of the government's evidence would seem to portray the subjective intent required by the charges filed against him and a keen awareness of the unlawful nature of what he was doing.

But wait, he protests, what you see and what you read on my exchanges with "christy13" is not what you get. I'm not an online predator trolling for naive juveniles, my true intent — hard to discern though it may be — is to sexually hook-up with mature females who are hanging out in juvenile chat rooms posing as minors. I'm merely a "lonely divorcee [sic]

looking for an older woman who may have a place to go," because I do not have a place of my own. It's just a game of role playing. "[N]ormally in this sort of thing it would be a fantasy. Sort of like daddy/daughter or along those lines." My real intent was to hook up with a thirty to forty year-old role playing woman pretending to be 14-year-old who was interested in actualizing such an incestuous sexual fantasy, certainly not a minor. But of course, this is "my first time." "I haven't ever kissed anyone but my wife since — in fifteen years." And, by the way, "no one ever sends a picture of what they actually look like." Moreover, everything I wrote to "christy13" that makes it appear that I understood her to be a minor? It was just a lie.

How did I know — unsophisticated though I certainly am — that "christy13" was an older woman even though she said she was only fourteen? As I explained to the police:

Q.[1] Now as far as this person, they told you that they were fourteen.

A.    Right.

Q.    Did they tell you anything else, who they lived with or anything like that?

A.    Uhm, I . . . I'm not hesitating to give you information. It is not unusual to go on and do exchanges with many, many, many people. Uhm, and it . . . it is unusual to the point where this is the first attempt that I've had to actually meet anyone. But because of that, it's difficult for me to say which person and done which thing and at which time. So I don't . . . I'm . . .

---

[1]This conversation was between Curtin, Las Vegas Metropolitan Police Department Detective Castaneda, and FBI special agent Flaherty. Here, Curtin is responding to questions asked by Detective Castaneda.

I'm not intending to be vague. I just, uh, I can't remember who said what.

Q.  So you don't remember if Kristy [sic] told you that she lived with her mother and father or anything like that?

A.  I believe she said that but, uhm, again, that would be . . . if that were the case (laughing). I know I'm sounding like all these if, and's and . . . but if that were the case, it would be part of the fantasy, uh, on it. It wouldn't be, uhm . . . I would not expect . . . uh, let me rephrase that. I would expect anyone who's participating in this sort of thing to have their own place where one would go back and . . . and do the role playing . . . .

. . .

Q.  And what were kinda some of the things that she says that, uh, she has or has not done?

A.  Uhm, she had said that she didn't have any experience whatsoever with guys. Uhm, which again is a fairly common thing. And adds to my credence to my whole idea of . . . of a, uhm, fantasy because, you know, I . . . I'm not completely, uh, conversant with what's going on with kids today, but I don't know of 14-year-old girls who haven't at least kissed someone or, you know, fooled around somewhat or ___,

. . .

Uhm, the . . . the, uh, the picture that was sent was this attractive 14-year-old girl who, uh . . . uh, had never done anything with anyone, but

was willing to suddenly, uh, jump into bed . . . bed with a . . . a strange 42-year-old person from Riverside is beyond anything that I would imagine could be. You know, I . . . uh, I could see, uh, I could see an Internet connection along those lines if it went on for months and months and months and months and you grew a . . . an attachment and that sort of a thing. What brings it beyond any level of credence to me that it's actually possibly a 14-year-old girl is that you've got this innocent 14-year-old girl who's going to, you know, jump into bed with some guy, uh, after talking to him for two days. That's what led me to believe that there's no way on earth that it was . . .

Q.[2]  But, I mean, coming here, you had no idea, no way of knowin' that it wasn't a 14-year-old girl named Kristy [sic]. Am I right? Other than what you . . . you think it may be a fantasy, but as far as what y'all talked about, am I right in sayin' that you had no way of knowin'?

A.  You are right in saying that there is no concrete way that I could have known, uhm, that it wasn't a 14-year-old girl. However . . . (Both talking at once)

Q.  ___. Oh, no, go ahead. Keep goin'.

A.  Uhm, I deal with people all of the time and my experience has never been that someone who is, uh, an attractive person who's . . . who saved themself, not even kissed and not done anything, and, uh, uh . . .

---

[2]At this point Special Agent Flaherty questioned Curtin.

Not bad for a first-timer who had not kissed anyone but his wife in fifteen years.

Curtin's cover story and protestations of "no criminal intent" notwithstanding, federal prosecutors charged him with one count of interstate travel with intent to engage in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b), and one count of the use of an interstate facility to persuade a minor to engage in unlawful sexual conduct, in violation of 18 U.S.C. § 2422(b). Both charges required the government to prove beyond a reasonable doubt that Curtin acted with the intent to engage a person under the age of eighteen years in unlawful sexual behavior. To quote the court in its concluding instructions to the jury:

> In order for the defendant to be found guilty of [§ 2423(b)], the Government must prove each of the following elements, beyond a reasonable doubt:
>
> First, the defendant used a facility or means of interstate commerce.
>
> . . .
>
> Second, the defendant knowingly intended to persuade, induce, entice, or coerce Christy into engaging in sexual activity for which he could be prosecuted under the laws of the state of Nevada.
>
> Third, the defendant believed Christy had not attained the age of 16 years. . . .
>
> Under the laws of the state of Nevada, it is an offense to commit statutory sexual seduction. Nevada law defines statutory sexual seduction as ordinary sexual intercourse, anal intercourse, cunnilingus, or fellatio committed by a person 18 years of

age or older with a person under the age of 16 years.

. . .

[D]efendant's subsequent conduct may be considered by you or the question of the defendant's intent at the time he communicated on the Internet or traveled in interstate commerce.

[T]he fact that Christy was an undercover agent posing as a 14-year-old girl and that no actual minor child was victimized in this case is not a defense . . . .

## II

Prior to the trial, it became clear that the only disputed issue in this case would be Curtin's subjective intent: did he intend to hook up with a 30 to 40 year-old woman who liked to pretend she was a child having incestuous sex with her daddy, or with a pubescent minor? Curtin went so far as to file a motion to dismiss the indictment on the ground that the "undisputed and uncontested facts" made it patently obvious that the government had "no credible evidence to suggest that [Curtin's] subjective intentions were to travel to Las Vegas to have sex with a minor":

> Curtin did not possess an intent to have sex with a 14 year old girl when he got into his car and drove to Las Vegas; the overwhelming evidence points the other way. His voluntary statement, given minutes after he was stopped by the police, shows this. He thought it was all too easy, that no 14 year old was going to just hop into bed with a 42 year old after two chat sessions, especially a pretty girl. As he said in his statement, her Mary Poppins naivety was ***beyond any level of credence***. It was so easy and

uncredible that he even wondered if it could have been police. In any event, he was not concerned, because when he left California to go to Las Vegas, he was going to find work, and at the time he left California to travel to Nevada, he had no intentions of having relations with a minor, as irrebuttably shown by the fact that he did not so much as talk to the person. This meeting was the litmus test of his true intentions in this nebulous and hazy situation. He clearly and without question passed this test. When he calmly and simply walked away, the police wanted to know why. He told them. He clearly and unequivocally explained that he did not talk to this person because he stopped by the Suncoast with the hope and intentions of meeting an older woman. HAD HE BEEN THERE TO MEET A MINOR, AS IS THE CRUX OF THIS INDICTMENT, THEN HE WOULD HAVE INTRODUCED HIMSELF AT THAT POINT.

. . . Curtin's intentions were to try to meet a 30-40 year old woman who had been fantasizing. It is not even close. . . .

As the defendant's intent was not to have sex with a minor, nor to entice a minor, nor to travel interstate to have sex with a minor, . . . this case must be dismissed. In the instant case, the defendant did not think he was dealing with a minor. The police knew there [was] not a minor and in fact there was not a minor.

(Emphasis added.)

Thus, the line was drawn by Curtin. His defense was a matter of record. The trial would be about intent and what was in Curtin's mind during his undisputed conduct with "christy13." This was the issue, the only issue: subjective inten-

tions. As counsel for Curtin said in his opening statement, "[Curtin] thought it was someone his age that he was dealing with and that they would role play in a situation much like a dad and a daughter." Counsel concluded on this what-was-in-Curtin's-mind theme by telling the jury that "this is the type of crime that is a situation where you have to look at the thoughts." To prevail, of course, Curtin would not be called upon to satisfy the jury that his defense was true. All he had to do is raise a reasonable doubt in the mind of a single juror.

### III

Confronted with Curtin's aggressive fantasy intent defense — to sexually play daddy/daughter incest, not with a minor but with an adult — and facing the traditional daunting burden of proof, the government offered stories contained on Curtin's PDA, or "personal digital assistant." These stories were offered pursuant to Fed. R. Evid. 404(b) for two equally appropriate purposes: (1) to prove that Curtin harbored the subjective intent made unlawful by law, and (2) to rebut Curtin's defense that the daughter in his daddy/daughter sexual fantasy was an adult pretending to be a child. From the beginning, the government was put on notice by the court that in order for the stories to be properly admitted, each story would have to comport to the admissibility conditions of Fed. R. Evid. 401 and 404(b) as well as the probative versus prejudice limitations found in Fed. R. Evid. 403.

What was the content of the material on Curtin's PDA? It consisted of approximately 140 stories containing graphic descriptions of sexual acts with minors. Not a single story on Curtin's PDA was about daddy/daughter role playing with adults. The stories admitted in evidence are built around daddies having sexual relations with *child* daughters, not adults, and the content of the stories parallel Curtin's email exchanges with his target. I extract two representative examples:

LOVE for the WORLD
An Erotic Story

. . .

"Good morning, brothers and sisters. It's a splendid day the Lord has blessed us with; . . .

"I'm going to speak frankly, bluntly; and tell some truths that need telling. And I don't want any of you, friends, to send the kids to the next room or anything else because they might be shocked. If your child is old enough to understand what I'm saying, he or she must hear it along with you. These are TRUTHS that even children must learn. So gather around; call the children, and listen to the truth that has been revealed to me."

"In today's world, parents have a special duty towards their children. Gone are the days when we could pretend children were 'innocent' of the facts of life. Today's children, before they turn ten, and some even before first grade, know what sex is . . . And many of them have already developed an interest that some parents may feel uncomfortable with. That discomfort, is the matter I am going to address tonight; and what you must do, to not just overcome it, but to find true joy in doing the work of the Lord, by properly teaching your children the true JOY of sex, when practiced with those you love.

For it is truly up to the parents to steer their children right: into a healthy outlook on matters of sex. After all, it is not only a beautiful gift from the Lord; it is the very source of those precious children themselves."

"I will talk first about the responsibility of fathers. I must say that many fathers out there disgrace the

very meaning of the word. Yes, there are many who behave as though their role ends at begetting the child, or still hold to an old-fashioned sense of 'duties' that is limited to providing the groceries every week. THAT is not the way to bring up a child! Especially your daughters! Daughters need their father to be a strong presence, the very prototype of a manly image.

Men, your daughters need YOU, to be the FIRST MAN IN THEIR LIVES!"

"And I'm not talking any halfway measures here, friends.

When I say you must be the first man in your daughter's life I mean just that! Think about it: Your precious little girl, who loves you more than anything in the world . . . you love her too, don't you? DON'T you?"

"Then MATCH that love, gentlemen! Be not only the first MAN in her life; be the first MALE in her life! Yes, I mean exactly what you are thinking. I want you to be her first f...k!"

. . .

[Exhibit 7b]

Restrictions
An Erotic Story

"Margaret?"

"Yes Daddy?"

"You were sitting out there a long time, with Billy, weren't you?"

"Yes Daddy."

"Yes Daddy."

"Did you let him kiss you?"

"Only on the cheek Daddy."

"That's good. Did he do anything else?"

"Well, he put his arm around me."

"You stopped him, didn't you?"

"Well . . ."

"Oh Margaret, what am I going to do with you? You didn't let him do any more, did you?"

"Well, he tried to put his hand on me here, but I stopped him."

"Very good Margie. Maybe I can trust you after all. What did you tell him?"

"I told him, that if he didn't keep his hands where they belonged, he'd have to go home. I don't like to tell him that Daddy, he's a really nice boy. How come I can't let him touch me Daddy?"

"Because I'm afraid you'll go too far."

"Too far?"

"I guess I'll just have to show you. Come here, and sit on my lap."

"Ok Daddy. You mean, like I'm not supposed to sit on Billy's lap?"

"Uhuh. Oh, wait. First go change into your red dress, and top."

"The SHORT one Daddy?"

"Uhuh."

"But Daddy! You told me never to wear that one."

"Uhuh. I'll show you why I don't want you wearing it."

"If you say so, Daddy."

"I do. And Margie?"

"Yes Daddy?"

"Don't wear any nylons, or pantyhose either."

"Ok Daddy."

. . .

[Exhibit 7c]

To illustrate the material similarities between the stories in Curtin's PDA and the escalating salacious enticements he made on line to "christy 13," known as "grooming," here are some representative examples of his email conversations with her. They show an adult planning to initiate a young virgin into the world of adult sex:[3]

Christy: You don't mind that I'm 14?

---

[3]For ease of reading the format has been modified. The content of the conversation is unaltered.

Curtin: Do you mind that I'm 42?

Christy: No, not at all.

Curtin: Have you ever been with an older guy?

Christy: No, I'm still a virgin, if that is what you're asking.

Curtin: Well, what would you want to do with me? I'd love to make out with you. Is that weird?

. . .

Curtin: Do you masturbate?

Christy: No, never have. . . .

. . .

Curtin: Do you never get urges?

Christy: What do you mean?

Curtin: You never feel horny?

Christy: No. Is that okay?

. . .

Curtin: Do you have periods yet?

Christy: Yes.

Curtin: I just logged on and looked at your picture. You're so sexy that it's hard to believe you don't get horny.

Christy: I don't think that I'm pretty.

Curtin: I think you are, and I think you're sexy.

Christy: Thanks.

. . .

Christy: What should I do or how should — how far should I go?

Curtin: I'll probably go as far as you want to go.

Christy: I want to make you happy.

Curtin: I want to make you happy, too. If you were masturbating and fantasizing about sex, I'd love to have sex with you. But since you're not, I don't want to push you past anything you're ready for. . . .

. . .

Christy: I heard that it hurts the first time. Also, that you can get pregnant real easy. . . .

Curtin: There are things we can do to stop that.

. . .

Curtin: Or, we could just make out or I could just give you oral sex or we could just fool around.

Christy: Would it hurt if you gave me oral sex?

Curtin: No, not at all.

. . .

Christy: What should I bring to sleep in, my pj's or will my jeans and shirt be okay?

Curtin: Nothing. I don't want you to sleep in anything.

Christy: Really? Not even my underwear? Won't that be a little uncomfortable?

Curtin: No, that's the best way to sleep, all cuddled up, two naked bodies.

Christy: Okay, if you say so. I just think it would be uncomfortable.

Curtin: Try tonight and tell me if it is. And imagine my face moving between your legs and licking you. Imagine my tongue penetrating you.

Christy: I can't. Mom and Dad come in at night and check in on me and tell me all the time that they cover me up with my blanket. So they would see that I was naked and would ask me why. Plus, if my dad saw me naked, I would be so embarrassed.

. . .

Christy: . . . It won't hurt, right?

Curtin: No, it won't hurt.

. . .

Curtin: Have you thought about my head between your legs, licking you?

Christy: Yes. Kind of curious what that will feel like.

Curtin: Have you touched yourself there?

Christy: Only while taking a shower to was [sic] myself. Am I weird?

Curtin: No, I just thought you might have when thinking about me, about — thinking about we're going to do [sic].

. . .

Curtin: I did, by the way. I looked at your picture and played with myself thinking about what it would feel — what it would be like to have sex with you. You are so sexy.

Christy: Really? You did?

Curtin: Yes. . . .

Curtin: I want to make you feel so good. I want this to be the best you've ever felt.

Christy: Really? You're so nice.

. . .

Curtin: Can you get undressed?

Christy: No way. My little sister comes in and out of my room a lot and she would tell Mom or Dad that I did not have any clothes on.

Curtin: Rats.

Christy: Why? What were you going to have me do?

Curtin: Play with yourself. . . .

Christy: Oh, I never have done that kind of stuff.

Curtin: I know. I was hoping you'd start. No big thing. . . . It would just be sexy.

Christy: I'm going to feel so dumb when we are alone because I won't know what to do.

Curtin: No, you won't feel dumb. The only thing I ask is if something feels good, tell me. And if something feels bad, tell me. I just want to make you feel so good.

Christy: Okay, I will.

. . .

Curtin: I'm going to make it so good for you. I'm going to get you to come and come and come.

Christy: Will it hurt if you do that?

Curtin: No, it will feel real good. I'm not going to hurt you. Remember, I promised.

Christy: Okay. I get a little excited when I think about you being my first. . . .

Curtin: I'm going to love sucking on your breasts, your naked body in front of me, and moving down and licking you and putting my tongue in you.

. . .

Curtin: I'd love for you to put my d...k in your mouth. Would you do that?

Christy: If you want me to, I think I will.

Curtin: smiley face.

Curtin: I'll show you how to do that to drive a guy nuts. Smiley face.

Christy: To do what?

Curtin: Give a blow job. Put a guy's d...k in your mouth.

Christy: Really? You are going to teach me how to give a blow job? If my girlfriends only knew, they would be jealous.

Curtin: Sure. Smiley face.

Under the circumstances of this case, and especially given the nature of the defense, were the stories in Curtin's PDA of sexual contact with minors relevant? Certainly. The stories consisted by anyone's logic of "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. As acknowledged by the Supreme Court:

> Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston v. United States*, 485 U.S. 681, 685 (1988).

Curtin's possession in his PDA of these stories *on his person at the time of his intended encounter with "christy13"* clearly illuminates his thoughts and his subjective intent to carry out his daddy/daughter sexual initiation escapades with a juvenile, not an adult. Any lingering question of relevancy

was put to rest by Curtin's defense that it was all a fantasy directed at an adult.[4] The similarities between the solicitous "grooming" email conversations and the content of the stories is readily apparent.[5]

However, the district court did not admit all 140 stories, only five, taking great care in the exercise of its discretion to restrict their use to the main issue and to eliminate possible undue prejudice.

## IV

With all respect to my colleagues, *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998), does not dictate the outcome of this case, and its holding does not as a matter of law render abusive the district court's exercise of discretion. In the parlance of the profession, *Shymanovitz* is distinguishable.

First, unlike the specific intent crimes with which Curtin was charged, the combination of crimes in *Shymanovitz* — generally unlawful sexual activity with minors — required an entirely different type of mens rea from the specific intent required here. One of the crimes charged in *Shymanovitz*, "sexual penetration," did "not include any requirement that the defendant act with intent," *id.* at 1157, just that the defendant have engaged in sexual penetration with the victim. The

---

[4]The government may offer in its case in chief evidence rebutting an expected defense. *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981); *United States v. Necoechea*, 986 F.2d 1273, 1280 n.4 (9th Cir. 1993); *United States v. Henderson*, 717 F.2d 135, 137 (4th Cir. 1983).

[5]The record shows that the trial judge required the government to go through each story it sought to admit and identify that portion of the story that was similar to the Curtin's enticement of "christy13." *See infra* Part V. The majority opinion does not take issue with this analysis. Rather, the majority asserts that as a matter of law, reading material is categorically irrelevant and dissimilar for the purposes of Fed. R. Evid. 401 and 404(b). As set forth below, this unwarranted assertion is legally flawed, and contrary to congressional intent.

other crime, sexual contact with a minor, required touching that was intentional rather than accidental. Moreover, the actual purpose of the person doing the touching was immaterial. As Judge Reinhardt explained,

> [T]he charges based on sexual contact require the government to prove that any touching on Shymanovitz' part was intentional, and that a reasonable person could construe the touching to be for a sexual purpose.

> Whether Shymanovitz's *actual* purpose in touching the alleged victims was sexual arousal or gratification, however, or whether he was *actually* aroused or gratified by the touching is *immaterial* to the offenses, including the charges based on improper sexual contact. Instead, the question in the latter category of cases is whether a reasonable person could construe the touching to be for such a purpose. *The test, under the sexual contact statute, is an objective not a subjective one.* In short, it is the *character* of the touching that is at issue, *not the purpose of the intentional toucher.* Accordingly, the government's current and sole justification for admitting the challenged evidence goes, *once again, to the proof of an element immaterial to the offense.*

*Id.* at 1158 (emphasis added).

Second, the defense in *Shymanovitz* was not that the alleged touching and penetration were not accompanied by any requisite state of mind, but that the acts charged as crimes never happened. "His counsel argued that the boys and some of the parents had concocted the allegations against him . . . ." *Id.* at 1154. Moreover, Shymanovitz

> . . . never testified at trial that he believed sexual conduct with minors to be legal. Nor was there testi-

mony to indicate that he somehow lacked knowledge of or familiarity with fellatio, anal intercourse, or other general aspects of homosexual sex. Moreover, neither knowledge of the illegality of the conduct of which he was accused nor knowledge of the nature of the specific acts identified by the prosecutor constituted an element of the offense. More important, such knowledge would in no way tend to prove his guilt on any of the charges brought against him. Accordingly, it is highly unlikely that the government introduced the magazines to address the issues it argued they were relevant to during the prosecutor's closing arguments.

*Id.* at 1156.

In contrast, Curtin did testify at the trial, tendering an energetic defense that his intent was to couple with an adult female, not a juvenile. Shymanovitz's defense had nothing to do with intent or state of mind.

Third, the stories were in Curtin's possession when he entered the casino in order to meet his target. Not so in *Shymanovitz.*

Thus, given that the evidence under scrutiny in *Shymanovitz* was (1) not probative of *any* issue in the case, and (2) not relevant to Shymanovitz's factual defense, it was appropriate for the panel to conclude as a matter of law that it was not properly received pursuant to Rule 401 or 404(b). The evidence simply failed Rule 401's definition of relevancy and, therefore, also failed Rule 404(b). The evidence did not illuminate "a fact of consequence to the determination of the action," and was nothing more than an attempt to slime the defendant. *Id.* at 1154 (referring to the prosecutor's "untempered and provocative references" to the evidence).[6]

---

[6]The majority places great significance on our statement in *Shymanovitz* that "there is simply no doubt that a wide gulf separates the act of possess-

We recognized the limited reach of *Shymanovitz* in *United States v. Allen*, 341 F.3d 870 (9th Cir. 2003). The defendants in *Allen* were charged with intimidating or interfering with a person's housing rights on account of race or color, in violation of 42 U.S.C. § 3631. In order to satisfy the statute's requirement of a showing of racial animus, the government offered, and we admitted:

> . . . skinhead and white supremacist evidence, including color photographs of their tattoos (e.g., swastikas and other symbols of white supremacy), Nazi-related literature, group photographs including some of the defendants (e.g., in "Heil Hitler" poses and standing before a large swastika that they later set on fire), and skinhead paraphernalia (e.g. combat boots, arm-bands with swastikas, and a registration form for the Aryan Nations World Congress).

*Id.* at 885-886. The district court ruled (1) that this potentially inflammatory evidence was relevant to proving the defendants' motive, intent and plan, and (2) that its prejudicial potential did not substantially outweigh its probative value as demanded by Fed. R. Evid. 403.

On appeal, the *Allen* defendants challenged the trial court's ruling on the ground that the evidence was unfairly prejudicial. We disagreed, relying in large measure on our decision in *United States v. Skillman*, 922 F.2d 1370 (9th Cir. 1991),

---

ing written descriptions or stories about criminal conduct from the act of committing the offenses described." (Emphasis added.) From that statement the majority asserts that reading material can never be relevant to *any* crime. This over-generalization best illustrates the majorities failure to appreciate the fact that the "offense described" in *Shymanovitz* was *not* a specific intent crime. Thus, because specific intent was not an issue, reading material admitted to show intent would never be relevant. Here, as illustrated by subsequent case law, where specific intent is at issue, reading material can be relevant.

a race-motivated cross burning case wherein "skinhead" literature and materials found in Skillman's garage and on his person at the time of his arrest was used to prove Skillman's state of mind at the time of the crime, even though the government could not establish that Skillman was a skinhead. In *Skillman* we said,

> Skillman principally relies on *United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir. 1988), where we found it was an abuse of discretion to admit evidence of homosexual conduct of the appellant with his adoptive father in a case where the appellant was charged with transporting his three-year-old goddaughter for illegal sexual purposes. *Gillespie is inapposite since the alleged homosexual conduct did not tend to establish a violation of the statutes in issue*. Here, the skinhead evidence tended to establish Skillman's racial animus and that he might act on his beliefs. Skillman also contends that the skinhead references were cumulative to other animus evidence, including Exhibit 3, the business card with the racist poem found in his wallet as well as Milum's and Becky's testimony on Skillman's prior race statements. We conclude this evidence was not "needless[ly]" cumulative in light of the difficulty in establishing the requisite racial animus *and Skillman's theory-of-defense that he was a mere passive bystander at the crime*. The district court's evaluation under Rule 403 and the admission of the evidence was not an abuse of discretion.

922 F.2d at 1374 (emphasis added).

Accordingly, because we perceived in *Allen* the difference between cases involving specific intent and those that do not, we had no difficulty explaining why *Shymanovitz*, like *Gillespie*, was inapposite:

> The defendants cite to our decision in *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998), to support their argument that the admission of the skinhead and white supremacy evidence was unduly prejudicial. In *Shymanovitz*, we concluded that the district court abused its discretion by allowing the government to introduce testimony about the contents of magazines found at the defendant's apartment, including photographs of men masturbating, ejaculating, using sex toys, and engaging in oral and anal sex (among other things), to prove the defendant's intent in committing sexual acts with minors. 157 F.3d at 1155. *Key to our reasoning was the fact that the testimony was highly prejudicial and was not relevant to proving any of the elements of the crime for which the defendant was convicted (unlawful sexual activity with minors). Id.* at 1157-60. *In contrast, the skinhead and white supremacy evidence here was relevant to proving the element of intent* in both §§ 241 and 245(b)(2)(B). *Moreover, in light of the government's heavy burden of proving racial animus, we conclude that it was not an abuse of discretion to admit the evidence.*

*Allen*, 341 F.3d at 887, n.25 (emphasis added).

My colleagues attempt — unconvincingly I believe — to distinguish *Allen* on the basis of insignificant differences between the evidence in *Allen* and the evidence here. They point out (1) that "the evidence in *Allen* involved more than the possession of reading material," including photographs showing some of the defendants as active participants in "Heil Hitler" poses, (2) that the Nazi literature in *Allen* may not have been "fictional," and (3) that "the evidence in this case, and in *Shymanovitz* was extremely prejudicial," apparently as opposed to the evidence in *Allen*.

These minor differences are utterly insufficient to render *Allen* inapposite. First, that *Allen* involved evidence in addition to reading material is inconsequential, as each "offer of evidence is to be evaluated independently under the Federal Rules of Evidence and the relevant case law." *United States v. Bertoli*, 854 F.Supp. 975, 1079 (D.N.J. 1994) *vacated in part on unrelated grounds*, 40 F.3d 1384 (3d Cir. 1994). Second, I fail to see any material difference between real stories of sexual perversion and fictional stories of the same ilk. Both serve to excite sexual criminals and to fuel their perverted intentions. Moreover, whether a story's plot is fictional is not material to the question of whether the content of that story relates to and is similar to the conduct of the alleged criminal — thereby satisfying the requirements of Rules 401 and 404(b). Third, the majority's assertion that "the evidence at issue in this case and in *Shymanovitz* [as opposed to *Allen*] was extremely prejudicial," and thus distinguishable, fails to appreciate how the rules of evidence operate. Prejudice is a separate basis for exclusion that requires an independent analysis under Fed. R. Evid. 403 after it is determined that an offer of evidence is relevant and admissible. *See Weisgram v. Marley*, 528 U.S. 440, 453 n.9 (2000). As admitted by my colleges, the prejudice argument was waived by Curtin and is not an issue before us.[7]

Ultimately, the majority's reasons for distinguishing *Allen* are inadequate, especially when viewed in the light of the "literary" evidence approved in *Skillman* on which *Allen* relied. The evidence in *Skillman* included a "poem containing racial epithets" on the back of a business card in Skillman's pocket. We did not segregate out of our holding in *Allen*, the Nazi literature in his possession. Although literature per se has no special protection in this context as evidence — under the

---

[7]The majority's implication that possession of Nazi and white supremacy skinhead literature is not "extremely prejudicial" is hard to comprehend as the movement is directly associated with one of the most well-known tragedies of humankind.

First Amendment or otherwise — my colleagues have effectively made relevant literature categorically off-limits as a source of evidence as to a person's subjective intent.

One way to test the relevancy of Curtin's recent PDA downloads (and to illustrate the difference between the setting here and the circumstances in *Shymanovitz*) is to envision what we would certainly hold if Curtin's PDA stories[8] were of role playing daddy/daughter incest with female adults — not minors — and the district court had excluded the stories as "irrelevant." Curtin would have attempted to admit the stories into evidence to demonstrate that he intended to meet an adult. Without a doubt, a convicted Curtin would assert on appeal that the content of the stories shed light on his subjective intent and — as counsel put it to the jurors — his "thoughts" as he communicated with "christy13," and as he traveled interstate with the stories in his pocket to meet her; and there is no doubt that we would agree. Why? Because the stories would have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Such stories would corroborate his claim of adult incest fantasy. How else could he do that without evidence of "other acts," as they are called? Conversely, the absence of such adult stories coupled with the presence of stories wherein children are the objects of the sexual appetites of adults is equally relevant to prove the government's case and to confront Curtin's defense. Relevancy boils down to what our human experiences tell us, sometimes called common sense.

As explained in "McCormick on Evidence," Third Edition, Hornbook Series, Lawyers Edition,

---

[8]Or, maybe the testimony of a woman with whom he had played daddy/daughter.

> [H]ow can a judge know whether the evidence could reasonably affect an assessment of the probability of the fact to be inferred? In some instances, scientific research may show that the fact in issue is more likely to be true (or false) when such evidence is present than when it is not. *Ordinarily, however, the answer must lie in the judge's own experience, [the judge's] general knowledge, and [the judge's] understanding of human conduct and motivation.*

*Id.*, § 184 (emphasis added).

In Internet "sting" cases such as this involving claims of entrapment, the issue of what a defendant's state of mind was immediately prior to his contact with a sexual target purporting to be a minor is routinely a serious point of contention. We call the issue one of "predisposition," and it is primarily a question of fact. In *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000), for example, Poehlman, a cross-dresser, was charged with willingly crossing state lines to have sex with minors, but it appeared that when first contacted by the government, he was looking for adults with whom to engage in his "proclivities," not children. However, the undercover officer with whom he was corresponding deftly turned Poehlman's prurient interest to children, and he responded accordingly. In court, charged with a violation of 18 U.S.C. Section 2423(b), Poehlman relied on his initial interest in adults to demonstrate a lack of predisposition to involve minors in his sexual plans, arguing that the government took advantage of that lawful interest and unlawfully used it to steer him to children. In concluding that he had indeed been entrapped, we said, "The government thus played on Poehlman's obvious need for an adult relationship, for acceptance of his sexual proclivities and for a family, to draw him even deeper into a sexual fantasy world involving these imaginary girls." *Id.* at 702.

To what evidence did we look to verify a factually fatal lack of predisposition on Poehlman's part to target minors?

The same kind of material we now place "off limits" as a matter of law:

> By analogy, the fact that Poehlman willingly crossed state lines to have sex with minors after his prolonged and steamy correspondence with Sharon cannot, alone, support a finding of predisposition. It is possible, after all, that it was the government's inducement that brought Poehlman to the point where he became willing to break the law. *As in Jacobson, we must consider what evidence there is as to Poehlman's state of mind prior to his contact with Sharon.*
>
> On this score, the record is sparse indeed; it is easier to say *what the record does not confirm than what it does*. The government produced no e-mails or chat room postings where Poehlman expressed an interest in sex with children, or even the view that sex with children should be legalized. *Nor did the government produce any notes, tapes, magazines, photographs, letters or similar items which disclosed an interest in sex with children, despite a thorough search of Poehlman's home. There was no testimony from the playmates of Poehlman's children, his ex-wife or anyone else indicating that Poehlman had behaved inappropriately toward children or otherwise manifested a sexual interest in them.*

*United States v. Poehlman*, 217 F.3d at 703-704 (emphasis added).

Thus, the absence in context, and by implication the *presence* of child-oriented materials becomes acutely relevant to a defendant's material state of mind "prior to his contact" with the object of his sexual attention, and, as *Poehlman* reveals, such evidence is not only admissible, but critical. The

now-confused dissonance in the law of our circuit on this issue is regrettable, to say the least.

The circumstances here are analogous to those confronted by the Tenth Circuit in two cases, *United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999) (per curiam); and *United States v. Magleby*, 241 F.3d 1306 (10th Cir. 2001). Viefhaus had been charged with the use of a telephone to transmit a bomb threat. To illustrate (as required by the Supreme Court in *Watts v. United States*, 394 U.S. 705 (1969)) that the threat made by Viefhaus was a "true threat" and not just "political hyperbole," the court admitted "literature espousing hate and violence" and "Nazi propaganda" found in his home. *Id.* at 394-395. In turning away Viefhaus's challenge to this evidence, the court said, citing *United States v. Cox*, 957 F.2d 267 (6th Cir. 1992),

> When the defendant offers lack of intent as a defense, even though the government does not have to prove subjective intent as an element of the offense, the circumstances surrounding the making of the calls becomes relevant. The evidence offered clearly was probative of defendant's state of mind and tends to counter his allegation of benign purpose.
>
> . . .
>
> The only way a jury could properly assess the sincerity of Viefhaus' beliefs, as well as the likely effect Viefhaus' message would have on an objective listener, was to examine the circumstances in which the comments were made. Although admission of this evidence was harmful to Viefhaus, its probative value outweighed any prejudicial effect.

*Viefhaus*, 168 F.3d at 397 (sustaining conviction under 18 U.S.C. § 875(c)) (internal citations omitted).

In *Magleby* the defendant was charged with burning a cross on the property of an interracial family. Recognizing that "[d]irect evidence of the defendant's intent is seldom available," and that "[i]ntent can be proven from surrounding circumstances," 241 F.3d at 1321, the Tenth Circuit affirmed the admission in evidence of vile racist song lyrics frequently sung on occasion by the defendant, which referred repeatedly to African-Americans as "niggers." The court said,

> We now turn to Mr. Magleby's argument that the lyrics are irrelevant and unfairly prejudicial. Although the admission of the lyrics to the Screwdriver song was certainly harmful to Mr. Magleby's case, we conclude that its probative value outweighed its prejudicial effect. This evidence is probative both of Mr. Magleby's racial animus under 42 U.S.C. § 3631(a) and of his intent under 18 U.S.C. § 241.

> In *United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999), we held that the context in which an alleged threat is made is probative of whether a "true threat" exists. *Id.* at 398. In *Viefhaus*, the defendant was convicted of making threats against, interalia, African-Americans, Jews, and federal law enforcement on an answering machine "hotline." *The defendant asserted as a defense that he lacked the intent requisite to make a true threat.* We upheld the admission of racially inflammatory items as relevant to the defendant's intent.

> . . .

> As did the defendant in *Viefhaus*, Mr. Magleby denies having the requisite intent under 42 U.S.C. § 3631(a) and 18 U.S.C. § 241. The lyrics to the Screwdriver song, as well as the evidence that Mr. Magleby knew the lyrics and could sing along with

them, are probative of his intent under these sections. First, § 3631(a) requires that the government prove beyond a reasonable doubt that Mr. Magleby targeted the Henrys because of their race. *The lyrics and Mr. Magleby's familiarity with them are probative of his racial animus in burning the cross.* Second, under § 241, the government must prove beyond a reasonable doubt that Mr. Magleby had the specific intent to "oppress, threaten or intimidate" the Henrys in the enjoyment of their federally protected right to occupy property. *Context is important in determining whether a true threat has been made.*

. . .

The necessity of demonstrating the context in which the cross was burned renders the Screwdriver lyrics and other evidence of hostility toward the presence of African-Americans in this country intrinsic to a violation of § 241. And, as in *Viefhaus*, the only way the jury could properly determine the message conveyed by Mr. Magleby's cross-burning and the foreseeable effect it would have on the Henrys was to examine the circumstances in which the cross-burning was conceived, planned, and executed. We fine that the district court did not abuse its discretion in admitting the song lyrics into evidence.

*Id.* at 1319 (emphasis added). I note that part of the evidence used to show Magleby's subjective intent was the circumstance that he had watched a movie, "Mississippi Burning," prior to the cross-burning. *Id.* at 1313.

Indeed, in similar contexts we have routinely held that circumstances surrounding an alleged crime become *more* relevant when the defendant makes his intent a disputed issue. Take the case of Larry McCollum. McCollum claimed that although he entered a bank and gave an employee a note

demanding $100,000 he had "no criminal intent" to commit robbery because he was acting involuntarily under the influence of hypnosis. The district court admitted a prior conviction for armed robbery to counter his defense of a lack of intent. We affirmed, holding as follows:

> In this case, . . . the defense conceded that McCollum performed all acts charged by the prosecution. The key issue, indeed the only disputed issue, was whether McCollum acted with intent to rob the bank. Where the mental state to be inferred from undisputed overt acts of a defendant is the crucial issue, evidence of past criminal acts has generally been found insufficiently prejudicial to warrant exclusion.

*United States v. McCollum*, 732 F.2d 1419, 1425 (9th Cir. 1984) (emphasis added); *United States v. Verduzco*, 373 F.3d 1022 (9th Cir. 2004) (quoting *McCollum* and affirming the use of evidence of other similar criminal acts to counter an affirmative defense of duress).

With the utmost respect to my colleagues, they seem moved to brush *McCollum* aside by their assumption that the incest materials on Curtin's PDA were "otherwise lawful reading material." This premise is doubtful at best. Obscenity, which is described as a work which appeals to the prurient interest and which describes sexual conduct in a patently offensive way, and which when judged by contemporary community standards lacks serious literacy, artistic, political, or scientific value, is not protected by the First Amendment. *Miller v. California*, 413 U.S. 15, 24-25 (1973). I will leave it to the reader to decide whether "Love for the World" and "Restrictions" are otherwise lawful reading material. However, even if they were to be seen as lawful, this fact in no way renders them outside the scope of Rule 404(b). Rule 404(b) *on its face* covers "other crimes, wrongs, *or acts*." All relevant extrinsic *acts* are presumptively admissible, subject to Rule 403. The act of possession of reading material falls

within this Rule, whether lawful or not — so long as the act of possession is relevant.

Bottom line? *McCollum* is apposite.

The precedents discussing the use of other evidence to establish criminal intent where intent is denied are literally endless. In *United States v. Brunson*, 657 F.2d 110, 115 (7th Cir. 1981), our sister circuit said,

> The remainder of appellant's contentions are equally unpersuasive. Appellant complains that the trial judge erred in admitting the Government's evidence of appellant's prior allegedly criminal conduct relating to counterfeiting after appellant had admitted that conduct on the stand. The evidence, as stated previously, was offered and admitted in rebuttal to appellant's main defense that he did not intend to use the counterfeit money to defraud anyone. The admission for such purposes was clearly proper both because intent was a necessary element of the crime and because of appellant's chosen defense. Fed.R.Evid. 404(b); *United States v. Weidman*, 572 F.2d 1199, 1202 (7th Cir. 1978), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113; *United States v. Semak*, 536 F.2d 1142, 1145 (6th Cir. 1976); *United States v. Onori*, 535 F.2d 938, 943 (5th Cir. 1976).

(Emphasis added).

As was said in the English case of *Regina v. Gill*, (1963) 1 W.L.R. 841, 846 (Crim. App.):

> The accused, either by the cross-examination of the prosecution witnesses or by evidence called on his behalf, or by a combination of the two, must place before the court such material as makes duress a live

issue fit and proper to be left to the jury. But, once he has succeeded in doing this, it is then for the Crown to destroy that defence in such a manner as to leave in the jury's minds no reasonable doubt that the accused cannot be absolved on the grounds of the alleged compulsion.

(quoted in *United States v. Hearst*, 563 F.2d 1331, 1336 n.2 (9th Cir. 1977)).

**Volume 2 of 2**

## V

My colleagues have concluded that the district court "abused" its discretion in admitting this evidence. Far from it. In fact, the district court's conduct is a model of appropriate judicial decision making, as a close reading of the record reveals.

Because my colleagues' conclusion that the district court abused its discretion is inconsistent with the record, I reproduce relevant parts of it in (excruciating) detail. The record speaks for itself better than characterization and adjectives. In summary, what we see is a court taking great care to follow the law and to protect the rights of the defendant. The court:

(1)   considered *Shymanovitz* and *Allen*,

(2)   accepted our legal guidance in *Allen*, and determined that *Shymanovitz* was distinguishable,

(3)   required that the five stories admitted be factually similar to the facts of the defendants approach to and enticement of "christy13," consistent with relevant case law interpreting Rule 404(b).

(4)   blocked the government from introducing approximately 135 stories, because they were redundant, inflammatory, and unduly prejudicial,

(5)   acceded to the defense's request not to highlight particularly damaging parts of the stories,

(6)   ruled after careful consideration — and as required by Fed. R. Evid. 403 — that the probative value of these stories was not under-

mined by their potentially unduly prejudicial effect, and

(7) gave multiple cautionary instructions to the jury as required by Fed. R. Evid. 105 as to what the stories were admissible to prove, including what purposes for which the jury could not consider them.

I elaborate.

To begin with, the district court was acutely aware of the *Shymanovitz* case. Long before the trial, the defense brought it to the court's attention in a "motion in limine to exclude," a motion that was not successful. [C.R. 22] The government responded in writing on July 8, 2003:

> Defendant relies on *Guam v. Shymanovitz* for the contention that "mere possession of fictional reading material that describes a particular type of activity [would] not make it more or less likely that a defendant would intentionally engage in the conduct described." Defense Motion in Limine, p.4, lines 25-27 (June 30, 2004). However, *Shymanovitz* can be distinguished from the present case based on the Ninth Circuit's statutory interpretation and the differences between the relevant statute in *Shymanovitz* and the statutes the Defendant is accused of violating. [C.R. 34].

To demonstrate the asserted distinction, the government relied on *Allen*:

> [T]he Ninth Circuit has expanded further that "[key]" to our reasoning [in *Shymanovitz*] was the fact that the testimony was not relevant to proving any of the elements of the crime for which the defendant was convicted." *United States v. Allen*, 341 F.3d

870, 887, n.25 (9th Cir. 2003). . . . By the above rea-
soning of the Ninth Circuit, this court clearly may
admit literature in the possession of the defendant for
the purpose of proving an element of the crime. It
can only be presumed that the more fundamental the
element is to the crime charged, the more the balance
weighs in favor of admission because [Fed. R. Evid.]
404(b) is a "rule of inclusion." *United States v.
Ayers*, 924 F.2d 1468, 1472 (9th Cir. 1992). [C.R.
34]

Next, we go to Day Two of the trial. After testimony on
Day One from the detective who corresponded as "christy13"
with the defendant and who questioned him after his arrest,
the government called as a witness a computer expert who
worked for the FBI and who had recovered the disputed sto-
ries from Curtin's PDA. When the government then attempted
to offer the entirety of one of these stories in evidence, the
district court intervened, and the following occurred outside
the presence of the jury:

MS. KOPPE: That [story] came off of the Defen-
dant's PDA?

WITNESS: Yes, off the — this is another one of the
144 stories that were — were in that Documents to
Go

. . .

MS. KOPPE: What is the title of that story, if you
could look on the second page?

WITNESS: Melanie's Busy Day (phonetic).

MS. KOPPE: Your Honor, we would move to admit
that story for modus operandi, intent, preparation,
and knowledge.

MR. POTTER [counsel for the defendant]: Your Honor, I would object and I would renew the same motion [to exclude the stories] that — we're talking about —

THE COURT: I do have a problem. I'm about ready to grant the objection, Counsel. If you'd come over to the sidebar just a moment.

(Sidebar at 03:26:24 p.m.)

THE COURT: I had understood [from pretrial discussions] what you were going to do is, in order to facilitate the foundation, was to introduce particular parts.

I have no problem with your asking him generally what is the story about, is it a story about sex between an adult and a minor.

I had thought you were going to ask specific questions about specific parts of it that tended to show, assuming that the debtor (sic) read it, and intent that would correspond to your alleged intent for him or his modus operandi, his knowledge.

That's what I thought you were going to do.

MS. KOPPE: That —

THE COURT: Because, otherwise, if all you're doing is offering these generally and you're just stating the purpose, we don't have sufficient foundation.

MS. KOPPE: Well, your Honor, that is what we're going to do. The problem is we need to get them through this witness because he's the one who did the examination of the PDA.

We're going to use another witness to testify to them because he scanned them and someone else —

THE COURT: All right. Then all you need to ask this witness is, are they on the PDA, and what you've already asked, do they have to be opened, unzipped —

MS. KOPPE: Right.

THE COURT: — before they're transferred.

MS. KOPPE: But I was just admitting them through him because he's the one who found them. That's —

THE COURT: Well, then I have a problem because you have not done sufficient foundation. I think you've done enough with this witness (indiscernible) to tie it into intent and knowledge, method, preparation.

You need to have a witness on the stand who you go through with, here is the section that relates to intent; here's something that shows common language with the e-mails; here's something that shows method that's actually present —

MS. KOPPE: Right.

THE COURT: — allegedly in this case. That's required for the foundation.

I think it would only be appropriate then to admit the document. I mean, you can admit it before, subject to showing that foundation and then proceed to —

MS. KOPPE: Okay.

THE COURT: — point out those particular areas.

MS. KOPPE: I can move for the conditional admission of them once he identifies them, if that's —

THE COURT: Subject to further foundation.

MS. STANISH [counsel for the government]: And to expedite it, perhaps just introduce them as a bulk exhibit. These all came off the PDA (indiscernible) —

MS. KOPPE: Establishing —

THE COURT: Subject to establishing the foundation that I require.

MS. KOPPE: Right.

MR. POTTER: Well, my gut is the exhibit coming in, it's — he's testifying as to what his belief is.

The entire exhibit doesn't need to come in because the very exhibit doesn't show what we talked about. These stories are not even dealing with the same act.

I mean, these are prepubescent-type stories, at least some of them are.

THE COURT: Yeah.

MR. POTTER: And that's completely (indiscernible) —

THE COURT: I think I'd have to overrule that if, and *only if, you can show — for example, if you show here's common language to what he used in his e-mail*.

*Or if you can show, for example, that here is common method. This is — here's a story that describes how you cultivate, and that's just exactly how he did it here.*

*Then you've established the foundation*, in which case I think it's appropriate, subject to the limiting instruction, to have the story admitted.

MR. POTTER: The only thing I would point out is that in, like, sexual assault cases where — or, sexual abuse type cases, when they bring in the prior bad acts — and what the courts have looked at is the same type of abuse and the same kind of factors, if it's age or if it's —

THE COURT: Right.

MR. POTTER: — convenience, meaning opportunity. We don't have that here. (Indiscernible). These stories are completely different, your Honor.

THE COURT: They are. And, of course, either on voir dire or out of the presence of the jury you can point that out and I can rule.

In spite of what's read outside the presence of the jury, there's insufficient foundation for that particular story, you point that out [sic] them.

MS. KOPPE: Well, your Honor, Counsel, first of all, argued in his opening that this is all about fantasy and these are all about the defendant's fantasies.

THE COURT: I understand. I understand.

MS. KOPPE: *And this shows what his fantasies are and this shows his intent. Counsel argued he never had the intent to have sex with a child.*

This goes to show that he has intent. They show — certain [sic] of the stories show other things as well. But —

THE COURT: I'm inclined to agree with you that one or a few or a general testimony about, generally, that they're — we don't know this yet, but generally there are a hundred-and-some-odd stories and they all deal with — none of them deal with sex between two adults.

MS. KOPPE: Right. I was getting into that actually.

THE COURT: They all deal with — I have no problem with your asking that kind of — this isn't the right witness to ask it.

MS. STANISH: Your Honor, may I make a suggestion that hopefully can expedite and clarify this without posing a problem for the jury?

The documents were located on the PDA obviously in his possession. The documents speak for themselves.

It seems to me, your Honor, that perhaps a way to resolve this is to have a preliminary determination by your Honor with respect to each of these documents.

That would be a preliminary legal determination as to whether your Honor is satisfied that the contents satisfies the 404(b).

THE COURT: I don't care whether you do it out — I would just assume that you would do it outside the presence of the jury. That's fine. Or you can do it in the presence of the jury, but, again, you must tie each one in.

I'm going to let you ask, generally, the question even without admitting them, do all of these stories relate to sex between an adult and a minor. I'll let you ask that question.

*But if you want the story in, you must ask with respect to that story, regarding those particular parts that deal with intent, method —*

MS. STANISH: Well, your Honor, can I suggest this then? It's my understanding — and I've read these stories — each story involves sex with a minor.

THE COURT: You can ask that question.

MS. STANISH: And that being said, your Honor, each — then each story is, in fact, offered for the purpose of establishing intent.

THE COURT: No, then I think the objective is good. It's prejudicial. It goes — I mean, let's say on his PDA he has 100 and over on his general computer he has 500 stories that just deal with sex between adults.

Or let's say there are other stories there that deal with fantasizing sex between two adults, one of them role-playing a minor. You could just as well take the inference he just likes to read sex stories, that's all.

*It's only because you can tie it into a particular intent, otherwise I'm not going to let him read the story. It's prejudicial. It's inflammatory.*

MS. STANISH: Well, I understand what you're saying. That would be more of a 404(3) [sic] ruling, as I understand it, as to prejudice.

But just so I'm clear and that we know what direction to go, your Honor, the intent that's involved in this particular offense is to establish, of course, that he crossed the state lines in order to have intent [sic] with a minor.

THE COURT: I understand clearly, and I think I've given you my ruling.

*If what you're doing is just saying here's some PDA stories and it shows that they were between adult and minors, that to admit them, the whole bulk of them, the prejudice outweighs the relevant portion; that is, it relates to his intent.*

But if you want to ask, generally, before they're admitted, do they all pertain to that kind of sex (indiscernible) question.

*And if you want to admit any one of them particularly so that the jury has the right to read the entire darned story, you've got to tie it in, portions of it, to the particular four objectives you've told me it's offered for. Okay?*

MS. STANISH: Okay.

THE COURT: And you can either do that with this witness or a subsequent, to reach those particular portions that tie it in first before I admit the entire story.

MS. STANISH: And do you have a preference, your Honor, whether we do this in front of the jury or —

THE COURT: It's okay with me. In other words, maybe you haven't done the homework yet to even do that. You just wanted them in, generally.

MS. KOPPE: No, we have looked through them and, you know, we picked the 21 stories —

THE COURT: Right.

MS. KOPPE: — that were —

THE COURT: Hopefully because they related to one of those four objectives.

MS. STANISH: Right. And intent is, of course, at least in my view, the predominant purpose for which these are admissible. And I think I understand your Honor now to say that these do, in fact, relate to intent.

Your bigger concern is one of prejudice; that we're not bringing in the 156, but we can bring in a sampling of the stories that just deal with the intent issue.

THE COURT: So what you're telling me is there isn't anything in these stories that relate to method or any common language to (indiscernible) —

MS. STANISH: No, I'm not saying that. I'm saying all of them do have in common the intent issue.

And honestly, Ms. Koppe prepared this part of the case more than I did. They all, though, deal with intent. Others have other purposes for which they could be offered.

I'm just trying to come up with a solution —

THE COURT: Well, then you can ask the witness with respect to this story. Hopefully it's got some-

thing else to do with knowledge; here's how you cultivate a young person, or method.

MS. KOPPE: Or knowledge (indiscernible).

THE COURT: But assuming it doesn't and all you're offering it for is intent, you'll tell me that. But hopefully you'll have a witness that says this talks about sex with a minor.

You'll also tell me that there is a witness that will tell us that's what all these stories relate to, including the ones we're not admitting here. So that otherwise (indiscernible) the same time, having the stuff, reading the stuff.

MS. STANISH: I agree, your Honor.

THE COURT: So —

MS. STANISH: But 404(b), of course, doesn't require that.

Another solution I might suggest, just to make this go smooth, really, is I've seen cases, for instance, where there's possession or a number of photographs of defendant's genitalia, for instance.

And we're allowed to bring it in because it does relate to the issue of eliciting and inducing the minor.

THE COURT: Right.

MS. STANISH: But because there's so many — the 404(3) [sic] concerns —

THE COURT: You do a couple.

MS. STANISH: — then we just put in a few. Would your Honor be satisfied if we put in just a fewer number? I understand we could —

THE COURT: No, I didn't even discuss that.

MS. STANISH: Okay. I wasn't sure —

THE COURT: *I have a problem with all of them.*

MS. STANISH: I was trying to — pardon me?

THE COURT: *I don't have a problem with all of them as long as you do what I ask you to do.*

Ms. STANISH: Yes, sir. All right.

. . .

MS. STANISH: After consulting with Mr. Potter, I think the parties agree that this would be best done as a preliminary legal determination as to each one. We don't want to taint the jury at this point.

. . .

THE COURT: Thank you.

(Jury out at 03:43:13 p.m.)

. . .

THE WITNESS: These — these — these exhibits are —

THE COURT: You can leave those there and you retrieve your notes.

. . .

THE COURT: Thank you. Now, for the record, we're going to take up with respect to each of these stories.

If you've marked sections that relate to any one of those four objectives for which you're offering it, outside the presence of the jury, as foundation for its proffer.

MS. KOPPE: Your Honor, we would state, initially, that each story does show intent to engage in sex with children.

THE COURT: Because, generally, it's a story of sex between an adult and child.

MS. KOPPE: That's correct, your Honor.

THE COURT: Okay. *You'll tell me if any one of them do* [sic] *not involve actual description of sex but, rather, is simply method, for example, of cultivating a child rather than actual description of sex between adult and child.*

MS. KOPPE: Your Honor, the story that was already admitted and testified about, My Little Sister, contains language about a nine year old engaging in sex and about the sex hurting at first but the nine —

THE COURT: *With a brother, correct*?

MS. KOPPE: I'm sorry?

THE COURT: Just be a little more complete with me, please. Sex between a nine-year-old girl and her brother.

MS. KOPPE: Yes.

. . .

THE COURT: Go ahead. I'm sorry. The fact that it did not hurt.

MS. KOPPE: The fact that it hurt at first. She was told that it will stop hurting and that it will feel a lot better. And that she then says it's okay, it's starting to feel good.

That's similar to language the defendant used when he told Christy that the sex would — he would take it slowly and that it would feel really good.

The next story, which is Love For The World —

MR. POTTER: Your Honor, are we going to go through them one at a time or —

THE COURT: *We're going to go through them one at a time*.

It might be helpful, too, if you had just told us on which page — if you have marked — I'm assuming we have the same format even though — *well, they do have page numbers, even though they don't occur between the pages — there between the various items*.

Did you intend to have us — to relate to us which items — for example, are you going to have a witness read particular parts, leaving the entire exhibit for the jury?

MS. KOPPE: I think that they do have other things in them.

. . .

THE COURT: Just go ahead and tell us which parts you have marked that relay the particular content that you've told us about.

MS. KOPPE: I could have a witness read them. But the content that I was speaking about started at the bottom of the page that's marked 4. It's marked 4 towards the top, and it goes through the part that's marked 5. The story I don't see what —

THE COURT: So, page 4. Uh-huh. Okay. *I've marked that on my copy.*

That way Mr. Potter, over the evening, of course, can review them to see if, in fact, they support the foundational purpose for which you're offering it.

MS. KOPPE: Your Honor, if we can come back to the second story. I'm going to need to look through that myself.

THE COURT: Okay.

MS. STANISH: (Indiscernible) expedite it.

MS. KOPPE: Your Honor, Ms. Stanish has just suggested, this would probably expedite it, if first thing in the morning we provide both your Honor and defense counsel with the highlighted portions of these stories.

THE COURT: You don't have that here?

MS. KOPPE: I do have highlighted portions, but I don't have copies that are highlighted for both your Honor and for counsel.

. . .

THE COURT: Is that sufficient, Mr. Potter, or do you need a little time to look at them?

MR. POTTER: I probably need to look at them, but I don't know if —

MS. KOPPE: I can keep going through it.

MR. POTTER: Do you have a public copier, by chance?

THE COURT: We do have a copy machine, of course. The problem is whether or not the highlighting would show through on a copy, I suppose. What color is the highlighting?

MS. KOPPE: Blue.

THE COURT: Blue. Would that show up on a copier? It does. Then, of course, we can take them and provide you a xerox copy of each of these over the evening recess.

MS. KOPPE: That's fine. Either way.

MR. POTTER: All right.

. . .

THE COURT: — and just as you've been doing, identify the purpose and, with respect to foundation, without telling us particular paragraphs, which you will give us by way of the copy we'll provide tonight.

MS. KOPPE: Okay.

THE COURT: If you'll just tell me the foundational purpose and what general parts of the story, just as you did with the first story; that is, did not hurt, felt good, et cetera.

MS. KOPPE: Okay. Your Honor, skipping the second story for the moment, the story Melanie's Busy Day —

THE COURT: Uh-huh.

MS. KOPPE: — there's language concerning a child masturbating, as the defendant wanted this child to masturbate.

There's also language of the adult — it's actually her father — telling her how pretty she is. There's also language that both of her parents perform oral sex on her, and the defendant talks about performing oral sex on her. And —

THE COURT: And, again, this is the general intent you talked about before.

MS. KOPPE: This is general intent as well as modus operandi and preparation —

THE COURT: Okay.

MS. KOPPE: — and knowledge. And I can give you where those parts are.

THE COURT: You'll give it to us in the form of the copy we're going to provide.

MS. KOPPE: Okay.

THE COURT: They're marked, I assume.

MS. KOPPE: In that same story, your Honor, the little girl is also given oral sex by her grandfather and the grandfather also talks about how pretty she is.

Going to the next story, which is called Missing Big Brother.

THE COURT: Again, I'm going to assume general intent on each of these unless you tell me otherwise.

MS. KOPPE: That's right. This story talks about —

MR.   POTTER: Which one is this one now?

MS. KOPPE: This is Missing Big Brother. The big brother engaging in — big brother is 18, it looks like, and the girl is 14.

It talks about the girl not wearing any panties underneath her skirt. It's one of the things the defendant talked about.

It talked about how when he had sex with her, he didn't want to hurt her during sex and he wanted her to like it so much she would be continuously coming back to him. The defendant talked about how he would make it feel good for this little girl.

And that we offer also for intent, but as well for modus operandi, preparation, and knowledge.

The next story is I'm Being Molested, and it also talks about sex for children not hurting and how can it be called abuse when it felt good and they were asking for it after it happened, the girls, and it involved sex with their father.

It also says that, did it hurt? I suppose a little but then it felt good. And it talks more about you may

call it molestation, you can call it abuse, we don't think about it that way in this family.

This story, The Good Girl, which is the next story, is where the defendant — excuse me, the defendant in his chat talked about how he was willing to be patient and wait until Christy was ready to have sex with him.

This person talks about the same thing to the girl. I believe she's 14 at the time. And talks about fooling around without having sex, which the defendant also discussed.

It goes toward modus operandi, intent, preparation, and knowledge.

The next story should be Pregnant No. 2 (phonetic). This story contains language similar to that used by the defendant in chats concerning oral sex.

It also talks about how the defendant was talking about how being naked is more comfortable than being clothed.

In this story, the girl talks about how her clothing drivers [sic] her crazy. It's too abrasive. And it talked about oral sex as well.

And goes toward modus operandi, intent, preparation, and knowledge.

The story, A Relative Language — excuse me, A Relative Interest, has language concerning — the defendant had spoken to Christy about imagining his tongue sliding along inside of her.

This has language similar to that regarding oral sex, and it's clearly with a child as well.

It goes towards intent, modus operandi, preparation, and knowledge.

The story, Restrictions, has the father telling his daughter, who is a child, that she's sexy, that she should wear barely any clothes, that she should walk around naked, that she's cute, sexy again, and talks about — it shows a way of seducing — it's a methodology of seducing a child, basically.

There are several descriptions of the father getting his daughter to engage in sex with him, basically, bit by bit.

It goes towards intent, modus operandi, preparation, and knowledge.

The next story is A Matter Of Taste, and that story talks about — it has a description of giving male oral sex and wanting the minor to feel good during oral sex. I believe the girl is 12 in this story.

Starting on page 12 where she's talking about giving oral sex to her father and that she does it better than anyone else. And the defendant said in his chats that he would teach Christy how to do that. It also talks — well, it talks more about that.

And that goes towards modus operandi, intent, preparation, and knowledge.

This story, Teaching The Kids, has a lesson on how to introduce children into sex. It's parents talking to their children.

It looks like there are three sons and two daughters. The oldest son is 15, the youngest is 11. And the two

girls are young. I don't see their age in the front page but it will be in here.

The parents decide it's time for the kids to learn about sex, and there's a methodology of how they seduce the children into engaging in sex.

It goes to intent, knowledge, modus operandi. It also talks about oral sex, which the defendant talked about in his chats.

The next story is called Mommy Juice (phonetic). And that story has a conversation with a mother teaching her children about sex and telling them that it will feel good before she has them engage in it. There's a part where it says, basically, that sex feels good to adolescent girls.

It goes towards modus operandi, intent. And it also has one of the girls, afterwards, telling her dad that it feels good. It goes towards modus operandi, intent, knowledge, and preparation.

The story My Sister And I has language about oral sex, engaging in oral sex with a minor and trying to please her. The defendant talked about how he would have Christy orgasm numerous times, and this story talks about that as well.

It goes towards preparation, knowledge, intent, modus operandi.

There's a fairly long description of performing oral sex on the minor. And then there's a part where the minor says if it hurts, you have to stop, and he promises to do so.

. . .

MS. KOPPE: The story Now Kids (phonetic), contains statements that sex is fun for everyone, especially young girls.

The father tells her, it feels real good, doesn't it? The girl then has sex with her older brother and tells him it felt really good; all language that the defendant said he would do with Christy.

That goes also towards knowledge, intent, modus operandi, motive.

The story Getting Out Of Hand also contains statements about sex being fun for young girls and feeling good. And that goes towards knowledge, intent.

The next story is — that story also talks about oral sex, which the defendant also talked about.

The story Peeping In On My Daughter has a 14 year old stating that she's not too young to engage in sexual intercourse.

It contains a statement that sex is fun for young girls and also how sex feels good and teaching her how to give oral sex to a man. And it looks like it's her grandfather having sex with her. It goes to intent, motive, and knowledge.

The story Horny Nieces has a discussion between ten-year-old girls and their father concerning whether the — will engage with their uncle who is coming to visit.

The father tells the girls that they should be careful when talking about it because some people think sex with children is wrong and their uncle may be one of

them. The story also contains the idea that the young girls enjoy sex and that it feels good to them.

This certainly shows knowledge that this is a crime and it's illegal and that there are people who believe that, and it shows motive and intent as well.

The story Heck Of A Job (phonetic) is a story about a guy who meets twins who are seven or eight years old. They never say for sure exactly how old they are, but they're young; seven or eight.

And he goes to their house and engages in — well, first it's a store and then at their house, engages in steps in order to — basically it's a methodology of seducing them into engaging in sex with him.

And it shows knowledge and intent, modus operandi and preparation. It also talks about oral sex on a female that's similar to the discussions the defendant had in the chats.

The story, Consent, contains a discussion of consent versus rape concerning young girls having sex. And the — contains the basic idea that even though the girl is young and below the age of consent, if, in fact, she consents, how can it be called rape. And that shows the defendant's intent.

The next story, Daddy's Lessons, talks about how sex only hurts at first. It has descriptions of oral sex on a man.

This is basically graphic language. It's the story of young children having sex with their parents and with each other.

After everyone has had sex with each other, the mother sits them down and tells them that they can never tell anyone what they do in their house.

She explains to them what statutory rape is. She tells them that what they engage in is, in fact, statutory rape and tells the kids that their parents would go to jail if they tell anyone, if anyone knows what happens in their house.

She also tells them that because of this type of crime, if her father goes — if their father goes to jail, then they — he would be killed because people don't like people who commit this type of crime.

And the final story is Playing Adult Games With Little Sister. It contains descriptions of manipulating children into engaging in sexual acts.

The mother, the adult, starts the manipulation and the rest of the story kind of escalates that manipulation, and it's a bit of a methodology of how to get these kids to engage in sexual acts.

There is also a part where they talk about our fantasies, basically, of sex — children having sex and how they were going to be coming [sic] true because of what's happening to their children.

This shows intent, modus operandi, knowledge, motive, and preparation.

THE COURT: Okay. Can we give those to Paula and ask her to run them and hopefully the blue part will show through so that — we'll give you a copy. You already have copies but, of course, this will be a copy of the markings. Okay?

And then if you — for purposes of demonstration to the Court or objection to the Court, before the jury comes in tomorrow morning, if you would make your objection; that is, this one just simply does not go to that particular purpose, the language isn't there or whatever, if you'll make that before we bring the jury back.

Anything further? Thank you, very much. We'll reconvene, please, tomorrow morning at 9:00.

(emphasis added).

Thus, the record reveals that the trial judge correctly required the government to demonstrates that the five stories admitted were factually similar to the defendants interaction with "christy13."

Day Three began on the same issue, with counsel for Curtin continuing to rely on *Shymanovitz* and Rule 403 to block the introduction of the stories. The government responded as follows:

MS. KOPPE: Your Honor, first of all, as far as Mr. Potter's argument that the articles are, in themselves, legal, 404(b) does not require that the other acts be illegal acts or even bad acts. It just requires that they be other acts that show one of the elements listed in 404(b).

These stories, every single one of them, proves intent. Every single one of them shows the defendant's intent. They all talk about sex with children. They all talk about intent to have sex with children.

The fact that the defendant possessed over 140 of these stories and carried them around with him, *go directly against his defense that he had no intent to*

*engage in sex with children, that that was not any-thing he wanted to do.*

. . .

*The defendant is the one who has immersed himself in this fantasy defense. The defendant is the one who is saying I didn't have the intent. I never had that intent.*

*And these stories that the defendant possessed and that the defendant carried around with him every-where he went and when he was committing this crime, they show his intent.*

. . .

In *Allen* (phonetic) the Ninth Circuit found that the literature in that case did go to an element of the crime and specifically distinguished that case from Shimonowitz [sic] because it said that the stories in that case did not go to an element of the crime.

These stories not only go to an element of the crime — intent is one of the most important elements of the crime, actually — it goes to the element of the crime that the defendant himself is attacking, pretty much the only element the defendant is attacking. And the defendant possessed these stories.

As far as 403, your Honor, these stories are not more prejudicial than they are probative. They're clearly probative.

. . .

The court continued to be concerned about the number of stories that should go to the jury:

THE COURT: Now, the last issue I wanted to address is I sure don't want to impose upon the jury the feeling that they have to read this entire book. How many stories was this?

MS. KOPPE: Your Honor, that was 21 stories. We're going to narrow it down —

THE COURT: You're going to limit it down to —

MS. KOPPE: — to 12.

THE COURT: — about half of it. That's helpful but it's still, number one, *it's potentially redundant* — like I said, after you get past the first story — *and it's also potentially biasing*.

In other words, we want the jury to limit themselves to these four issues — intent, methodology, preparation, and knowledge — and trying not to overemphasize this evidence in the context of all other evidence.

I simply want to make it very clear to the jury, you must not let this type of evidence bias you against the defendant. He has a constitutional right to possess such. But you must, and may, only take it for the four proffered reasons.

At this point, and having caused the number of stories to be reduced to five, the court addressed a final issue: whether to permit the jurors to read the entirety of each story, or just highlighted "snippets," the particular parts of each story going directly to the defendant's intent. The "snippets" had been previously highlighted in blue by the prosecution. The court said,

So, the only last question I had in my head is assuming that I let you introduce, in total, the first story, maybe the second one, which was, as much as I could read, *other than the snippets in the other stories*,[9] I did have a question overnight.

I still haven't quite resolved in my mind as to whether I should let you admit the entire rest of the other stories, other than just the snippets.

. . .

MS. STANISH: I think it's problematic to put, let's say, Agent Flaherty on the stand and have her say this portion relates to this purpose —

THE COURT: But don't you think it would be more proper, at a minimum, if you don't do that. That would be my preference, that you do it that way.

But if you don't do that, at a minimum, to put a witness on the stand who says we have highlighted those portions of the stories that relate to the four intended purposes.

I mean, if we admit it, generally, and tell the jury you've got to search through these stories for those intended purposes, then we've allowed the prejudicial effect of the volume and redundancy of the story to outweigh the four purposes.

. . .

---

[9]My colleagues' claim that the district court "was unable to read the stories" is not supported by the record. The court clearly had its own copies and read the "snippets" which highlighted the material that makes the stories relevant. Curtin does not object to the use of the entire story in lieu of the snippets.

THE COURT: . . . But wouldn't it be more appropriate, at a minimum, for you to have the witness testify that I have marked in blue — I mean, leaving it for the jury finally to decide whether it really is proof of these four elements.

But have you marked portions of these stories in blue? Yes. For what purpose? To show that they relate to either intent, or method, or preparation, or knowledge.

. . .

MR. POTTER: We're going to be doing the snippets, then, is that —

THE COURT: We would not be reading the snippets. We would be leaving it for the jury to find the snippets in those one — for the purposes for which I tell them are relevant; one, two, three —

MR. POTTER: I think that's —

THE COURT: — four, five stories.

MR. POTTER: If they're getting the whole story and then the snippets then emphasize. I mean, now they're getting . . . they're getting their attention drawn to something.

I mean, you make the decision of what is relevant and whether it is passed the muster of these four elements.

And, now, I think if we're going to give them the whole story, then they should be blank stories.

(emphasis added).

The issues having been resolved, the court then pre-instructed the jurors[10] as per Fed. R. Evid. 105 as to the limited purpose for which they could use this evidence the jury was about to hear, an instruction which the jurors heard more than once:

> THE COURT: I'm going to allow the prosecution to reopen their examination for a few additional minutes. They want to proffer some additional exhibits.
>
> And, therefore, I'm going to give you a brief instruction with respect to these exhibits. I gave you, initially, the same instruction yesterday. I'm going to give you the official version and then explain it briefly.
>
> You are about to hear testimony that the defendant had articles on his PDA that relate to other acts not charged here.
>
> I instruct you that the testimony is being admitted only for the limited purpose of being considered by you on the question of the defendant's intent, method, preparation, or knowledge, and for no other purpose. Let me explain the instruction just briefly.
>
> We all have, thank goodness, a constitutional right to have whatever literature we want in our homes, on our PDAs, on our computers.
>
> A person cannot be charged nor convicted of literature that they read or that they possess. That's why I'm giving you the instruction.
>
> But the Government has the obligation to prove, beyond a reasonable doubt, that the defendant had

---

[10]As did the court in *Allen*, 341 F.3d at 887, n.24.

the wrongful intent. They may offer possession of such literature to show that.

For example, most all crimes, state or federal, have, at a minimum, at least two elements. I'll instruct you at the end of the case on what the elements of these crimes are. And the Government must prove every one of them, beyond a reasonable doubt.

But most all crimes have a minimum of two elements: One, some conduct that's specified in the statute; and number two, a wrongful state of mind or intent.

The simplest example I can think of is murder. There is an act, homicide. And there's a wrongful intent, the wrongful taking of another person's life.

If you don't have that intent, you haven't committed the crime. If you're involved in an accident in your car and, unfortunately, someone loses their life in that accident, you are not guilty of murder.

There is a homicide, to be sure, but there is no wrongful intent. And, therefore, you're not charged, nor convicted, nor alleged with committing a criminal act. You may be sued in court civilly, of course. Therefore, there are two elements.

You may take this kind of evidence on the question of whether the defendant actually possessed the intent.

You may also take it on the additional questions which go to the question of intent, whether he practiced in this alleged conduct methodology consistent with literature that he had or tending to show that he prepared to commit the acts or that he had knowl-

edge, that is, of how to commit the act or that the act was illegal.

Again, the prosecution does not have to show that a defendant knew an act was illegal, simply that he committed the act and that he knew it was wrongful or that he had the wrongful intent. They don't have to prove that he knew it was illegal.

But evidence tending to show that he knew it was illegal may or may not tend to show that he had the intent.

So, for those four reasons, only, the Government is offering to show that the defendant possessed this literature; intent, method, preparation, and knowledge. And you may only take it for that purpose.

Again, you have a constitutional right. You have that right. You would want to protect the defendant's right to posses any kind of literature and to read it or not read it.

You must not allow this kind of evidence to bias you, generally, against the defendant on the ultimate question of guilt or innocence. You must not do that.

I'll repeat, finally, in conclusion, the official instruction.

You are about to hear testimony that the defendant possessed various types of articles on his PDA regarding other acts not charged here.

I instruct you that the testimony is being admitted only for the limited purpose of being considered by you on the question of the defendant's intent,

method, preparation, or knowledge and for no other purpose.

I hope you understand the instruction. With that, I'll permit the prosecution to proceed again today.

## VI

My colleagues' opinion stands for the questionable proposition that a trial court simply has no discretion in a case involving pedophilia to admit obscene sexual literature, even though the literature — as it does here — (1) sheds probative light on a defendant's relevant subjective intent, and (2) rebuts a defendant's primary defense of no criminal mens rea. My colleagues have made relevant literature off limits in the Ninth Circuit as a matter of law.

Ironically, Rule 404(b), a rule of inclusion, references at least three categories of other "acts" encompassing the inner workings of the mind: motive, intent, and knowledge. Once it has been established that the evidence offered serves one of these purposes, the relevant Advisory Committee notes make it clear that the "only" conditions justifying the exclusion of the evidence are those described in Rule 403: unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence:

> Note to Subdivision (b). The second sentence of Rule 404(b) as submitted to the Congress began with the words "This subdivision does not exclude the evidence when offered". The Committee amended this language to read "It may, however, be admissible", the words used in the 1971 Advisory Committee draft, on the ground that this formulation properly placed greater emphasis on admissibility than did the final Court version. House Report No. 93-650.

Note to Subdivision (b). This rule provides that evidence of other crimes, wrongs, or acts is not admissible to prove character but may be admissible for other specified purposes such as proof of motive.

Although your committee sees no necessity in amending the rule itself, it anticipates that the use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e., prejudice, confusion or waste of time. Senate Report No. 93-1277.

The Supreme Court embraced this understanding of Rule 404(b) and its handling of "other acts" in *Huddleston v. United States*, 485 U.S. 681 (1998):

Federal Rule of Evidence 404(b)—which applies in both civil and criminal cases—generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, *especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.*

*Id.* at 685 (emphasis added).

Moreover, the Court explicitly embraced the Advisory Committee's understanding of the Rule as reflecting the intent of Congress:

Petitioner's reading of Rule 404(b) as mandating a preliminary finding by the trial court that the act in question occurred not only superimposes a level of judicial oversight that is nowhere apparent from the language of that provision, but it is simply inconsistent with the legislative history behind Rule 404(b). The Advisory Committee specifically declined to offer any "mechanical solution" to the admission of evidence under 404(b). Rather, the Committee indicated that the trial court should assess such evidence under the usual rules for admissibility: "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." *[S]ee also*, S Rep No. 93-1277, p 25 (1974) ("[I]t is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i.e. prejudice, confusion or waste of time").

Petitioner's suggestion that a preliminary finding is necessary to protect the defendant from the potential for unfair prejudice is also belied by the Reports of the House of Representatives and the Senate. The House made clear that the version of Rule 404(b) which became law was intended to "plac[e] greater emphasis on admissibility than did the final Court verison." The Senate echoed this theme: "[T]he use of the discretionary word 'may' with respect to the admissibility of evidence of crimes, wrongs, or other acts is not intended to confer any arbitrary discretion on the trial judge." Thus, Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence.

*Id.* at 688, 689 (internal citations omitted). Thus, the majority's exclusionary holding defies not only the clear purpose of the Rule itself, but the Supreme Court's authoritative guidance.

This holding is not only legally wrong, but it extinguishes the discretion of a district court to decide questions of relevancy, inappropriately converting our standard of review from one that examines for an abuse of discretion into one that looks at a relevancy decision de novo. Their holding is a twistification of the principle that an error of law necessarily renders abusive an exercise of discretion based on that error. Here, there was no error of law. The evidence was relevant, period; and, as we observed in *United States v. Hearst*, 563 F.2d at 1337, n.3, "relevance is the essential criterion." Curtin had this evidence on his person when he entered the casino expecting to find "christy13." An officer testified that Curtin "had a Palm device, a PDA, and he was looking at — at it. He was looking at the screen [for five minutes] and he kept on looking up as if he was trying to verify the time or location." Curtin conceded in his testimony that he personally had downloaded these stories through a computer to his PDA because he believed they were "quite erotic." [Day 4, p. 23] The particular erotic story that attracted his attention was about a "17 year-old girl," and he downloaded them to find more of the same. [Day 4, p. 56] He caused them to be put out on his PDA in December, 2003, just two and one-half months before contacting "christy13." Curtin conceded "skimming" some of the downloaded stories.

## CONCLUSION

This case in combination with *Shymanovitz* improperly hamstrings the capability of the rule of law to cope in this Circuit with adults who see children as sexual prey. Congress has enacted a law protecting minors from this behavior, but we have misinterpreted the Rules of Evidence to make the law inordinately difficult to enforce. Without justification, this

holding handcuffs jurors when confronted with "no intent" defenses, turning such trials into the equivalent of "he said, she said" conundrums. My experience with jurors is that confronted with these situations, they want context, corroborating evidence, and other pertinent information which helps them sort out conflicting claims and assertions. Why? Not because it is prejudicial, but because it is relevant, whether it cuts for or against a defendant. As recognized by the Tenth Circuit in *Viefhaus* and *Magleby*, context and circumstances are important, and relevant literature can be used to this end — even if it is obscene. Now, we leave the jury high and dry without relevant evidence to look to in order to ensure the validity of their verdict. Such a handicap is legally wrong as well as unwise. At the very least, the district court's decision regarding the evidence eventually submitted to the jury was far from abusive. If somehow it is correct that *Shymanovitz* commands this result, then *Shymanovitz* is seriously defective and must be reconsidered. Thus, I respectfully dissent.